J. David **BABICH**, Plaintiff,

v.

**UNISYS CORPORATION**, Defendant.

Civ. A. No. 92–1473–MLB.

United States District Court,
D. Kansas.

Jan. 19, 1994.

Patricia M. Dengler, Smith, Shay, Farmer & Wetta, Wichita, KS, for plaintiff.

Phillip R. Fields, Wichita, KS, Stephen X. Munger, Lisa A. Schreter, Jackson, Lewis, Schnitzler & Krupman, Atlanta, GA, William M. Rossi, Jackson, Lewis, Schnitzler & Kraupman, Orlando, FL, for defendant.

## MEMORANDUM AND ORDER

BELOT, District Judge.

Plaintiff was terminated from his job with Unisys, at age fifty-two, as part of a reduction in forces ("RIF") layoff. He filed this employment discrimination lawsuit against Unisys claiming that, in discharging him, Unisys violated the Age Discrimination and Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140.[1] (Complaint, Doc. 1, Counts I & IV). Unisys filed a counterclaim asserting plaintiff breached his employment contract by continuing to receive and accept income assistance payments from Unisys after obtaining other "full-time" employment.[2] (Answer, Doc. 42).

Defendant Unisys now moves the court for an order dismissing plaintiff's ADEA and ERISA claims under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, granting Unisys summary judgment under Federal Rule of Civil Procedure 56. (Docs. 58 & 59). Plaintiff likewise moves the court for an order of dismissal or summary judgment in its favor with respect to defendant Unisys's counterclaim. (Doc. 64). Each party has filed a memorandum in opposition to the other party's motion. (Docs. 62 & 71–74).

## FACTUAL BACKGROUND

Defendant Unisys is a computer-based information systems company that manufactures, markets, and services computer equipment and associated software and professional services. Unisys was formed in 1986 as the result of a merger between The Burroughs Corporation ("Burroughs") and The Sperry Corporation ("Sperry"). Since the merger, Unisys has suffered financial problems which have compelled it to make major reductions in its workforce. The number of Unisys employees has been reduced, over the course of the last five years, from over 120,000 employees at the time of the merger to less than 55,000 today. (Renigar Affidavit, ¶ 6).

In order to properly carry out its reductions in forces or "RIFs," Unisys implemented a standard RIF policy. (Copy attached to Unisys's Motion for Summary Judgment; Ramirez's Depo., Exhibit 9). This policy provides that, in assessing which employees should be laid off, managers are to select those whose layoff would have "the least impact on the business." Managers must prepare "a memorandum ... of the business unit's objectives and skills and abilities needed to achieve those objectives" and "a listing of all employees in the decision-making manager's business unit ... [which includes,] in order of longest service first, each employee's name, grade level, length of Company service ..., *age*, sex, race and last two performance ratings." [3] (emphasis added). Then, depending on the situation involved,

---

1. Plaintiff's state law breach of contract and wrongful discharge claims have been voluntarily dismissed. (Doc. 69).

2. Unisys's claim for recoupment of unemployment compensation benefits has been voluntarily dismissed. (Doc. 74, p. 7 n. 4).

3. According to Unisys, the listing includes the employee's age so that Unisys's legal department can give special consideration to members of that protected group when making, reviewing, or overseeing employment decisions.

the managers are to consider the following factors in determining who to terminate:

> *Demonstrated Performance*—the manager is to review each employee's demonstrated performance, including the last two performance reviews; employees with a documented recent history of poor performance are to be laid off first; . . . ;

> *Skills Mix*—a comparison is to be made of the skills that the employee possesses and those that have been identified as needed to achieve the business unit's objectives;

> *Length of Experience*—experience on the job or in the sub group often translates into greater skills and abilities, better customer relations, greater knowledge of Unisys and internal resources, etc., and can be a factor. . . .

> *Length of Service*—in cases where employees are otherwise considered to be equal with respect to [the preceding factors] in meeting the unit's post layoff objectives, length of service . . . is to be the deciding factor.

Finally, managers are required to make recommendations for layoff and to give a written business justification for those recommendations, with assistance from human resources representatives.

Plaintiff began his work with what is now Unisys Corporation on March 23, 1959. He was employed as a Field Engineer, Field Service Manager, and Branch Field Engineering Manager for Burroughs in St. Louis and Little Rock from 1959 to 1977. While so employed, plaintiff handled a number of large mainframe accounts, such as the Bank of St. Louis, FHA–St. Louis, Murphy Oil Company, Commercial National Bank in Little Rock, and Laclede Steel. In 1977, plaintiff sought to relocate to Wichita where his parents resided. He was transferred to a Customer Service Systems Specialist position in Wichita, where he worked with such customers as FoxMeyer Drug Company and HCA/Wesley Medical Center. Plaintiff held that position until the Burroughs–Sperry merger.

After the merger, plaintiff was retained by Unisys to work in its Customer Services and Support ("CSS") division, which provided computer repair and maintenance services. He remained in the same Wichita office. The Wichita area, covering the southern region of Kansas, became part of Unisys's Kansas City District which was in turn part of Unisys's Central Region. Earl Locke, previously a Branch Manager for Sperry in Kansas City, was appointed Kansas City District Manager. As District Manager, it was Locke's job to select Field Service Managers to head the district's office in Wichita. One of the positions was filled by Bob Baker, who had formerly served as a Field Service Manager for Burroughs in Wichita. Other former Burroughs Wichita Field Service Managers were either promoted or voluntarily stepped down, leaving openings for new individuals to serve as Wichita Field Service Managers for Unisys.[4]

In April 1988, after considering a number of candidates, including plaintiff, Locke selected Philip M. Ramirez, a former Burroughs Products Support Specialist from Wichita, to be the new Wichita Field Service Manager.[5] Ramirez was assigned the Western Kansas Activities, Wichita General Products, and Medium Systems Activities accounts. (Locke's Depo., Exhibit 1). In this capacity, Ramirez was direct manager over the FoxMeyer Drug Company account, which was being handled by plaintiff. (Ramirez's Depo., pp. 45–46). Bob Baker supervised Eastern Kansas Activities, the Wichita "A" Systems, Wichita 1100 Systems Sites, and the Boeing Computer Service accounts.

A few weeks after Ramirez's selection, Bob Baker was transferred to Denver, and a Field Service Manager position in Wichita once again became available. Locke offered the position to plaintiff, and plaintiff accepted. Included in plaintiff's promotion was a fifteen percent hike in the position's salary

---

**4.** Sperry did not have an office in Wichita from which a Field Service Manager could have been recruited.

**5.** There is some dispute between the parties as to why Ramirez was promoted to Field Service Manager and plaintiff was not. That dispute does not appear to be material to the issue at hand.

which plaintiff demanded before he would accept the offer.[6] Ramirez took over the accounts that Baker had previously supervised, and plaintiff managed the accounts previously assigned to Ramirez.[7] (Locke's Depo., Exhibit 2).

In February 1990, Locke decided to make several changes in the management structure of the Kansas City district, including the Wichita office. As part of these changes, Locke announced that *all* field engineers in the Wichita unit would report directly to Ramirez. Ramirez became responsible for the Wichita office's day-to-day operations and personnel supervision; plaintiff was given the task of overseeing "escalated issues," such as system breakdowns.[8] In addition, plaintiff was specifically assigned responsibilities for an account with Lodgistix, one of Unisys's high profile customers in Wichita.[9] Plaintiff was not demoted. He retained classification as a Field Service Manager and received the same pay as before.[10]

In December of 1990, Unisys's CSS division decided, based on the revenues for the Central Region, that another workforce reduction was necessary. The Central Region District Managers, including Locke, were instructed as to how many people were to be laid off in each job classification. Locke was

6. The raise served only to keep pace with what Babich had previously been making, with overtime, as an hourly employee.

7. Unisys characterizes the division of labor between Baker and Ramirez and between Ramirez and plaintiff as being based on the size of the accounts. (Doc. 59, pp. 11–12). According to Unisys, after plaintiff's promotion, Ramirez was responsible for "large" systems accounts and plaintiff was responsible for "medium" ones. (Doc. 59, p. 12). Plaintiff disputes Unisys's identification of certain systems accounts as "medium" and "large" and contends that, at any rate, medium-sized accounts outnumbered large ones by eight to one. (Doc. 62, pp. 8–9). In his deposition, plaintiff states that responsibilities were supposed to be "evenly distributed as far as workload and main frame accounts and small accounts and geography." (Plaintiff's Depo., p. 182). In his affidavit, plaintiff maintains that the accounts were divided "simply by geography." (Plaintiff's Affidavit, p. 4). Although the court does not view this as a material dispute, plaintiff's explanation seems quite plausible, and the court, viewing the evidence in a light most favorable to the plaintiff, will assume plaintiff's characterization of the division of labor between him and Ramirez is correct. This will avoid the petty nitpicking over what does and does not constitute a "large" or "medium" account.

8. A similar change was made with respect to management in the Kansas City/Topeka area and the Omaha/Lincoln/Sioux Falls area. (See Plaintiff's Affidavit, p. 5; Locke's Depo., Exhibit 10).

9. There is considerable dispute between the parties concerning the Lodgistix account. According to Unisys, prior to the February 1990 changes in management, Locke had received a number of complaints concerning plaintiff's handling of the account. (Doc. 59, pp. 13–14; Locke's Depo., pp. 105–11, 217). Unisys contends that the plaintiff was specifically assigned to a "support role" over the Lodgistix account and that plaintiff's responsibilities over the account changed only to the extent that he was required to "focus very finely on that account" and that he was placed under "extremely tight controls." (Doc. 59, p. 14; Locke's Depo., pp. 106–07, 233). Plaintiff, by contrast, claims that he was given primary responsibility for the Lodgistix account, (Doc. 62, pp. 12–13), and that Locke told him that he was chosen for the job because of his "decision-making ability and customer problem resolution skills." (Plaintiff's Affidavit, p. 5). According to plaintiff, Unisys was having trouble with the Lodgistix account because it had no local representation to handle sales or service issues for that account, and, in order to alleviate this problem, plaintiff was specifically given the responsibility of overseeing the Lodgistix account. (Doc. 62, p. 12–13). Plaintiff claims that his title as "Support Manager" of the Lodgistix account was in addition to his primary title as "Field Service Manager." (Doc. 62, p. 13).

10. The parties dispute whether plaintiff continued to *function* as a Field Service Manager. According to plaintiff, he "shared" many of the responsibilities of Field Service Manager with Ramirez after the changes in management structure. (Doc. 62, pp. 11–12, 14). Plaintiff claims that Locke "didn't take any responsibilities away from [him, but] gave [him] responsibility ... because [he] had more management experience" with a particular type of account, and Ramirez had more experience with another type. (Plaintiff's Depo., p. 191). On this basis, plaintiff contends that his responsibilities actually *increased* as a result of the management changes. (Plaintiff's Depo., p. 191). By contrast, Unisys contends that, after the changes, plaintiff ceased functioning as a Field Service Manager and had only a "support" role. (Doc. 59, pp. 14, 16). Locke testifies that the changes "took the responsibility for all of the accounts ... and put them under Phil Ramirez and left [plaintiff] with Lodgistix" which, according to Locke, was a "smaller than medium size" account. (Locke's Depo., pp. 219–20).

told to reduce the number of customer service employees in the Kansas City district and to eliminate one of the Field Service Manager positions in Wichita by January 29, 1991. Pursuant to those orders and Unisys's RIF policy, Locke conducted a comparative evaluation of plaintiff and Ramirez, including performance reviews and a "staff adjustment analysis."[11] (Locke's Depo., Exhibits 8 & 11). Subsequently, he prepared a memoran-

dum recommending that plaintiff be terminated.[12] (Locke's Depo., Exhibit 12). In accordance with Unisys's RIF policy, this recommendation was reviewed and approved by designated executive and Human Resources personnel as well as a representative of Unisys's legal department.

On January 29, 1991, Locke met with plaintiff and informed him that he was being

11. According to plaintiff, his termination was not implemented in accordance with Unisys's RIF policy and Locke's 1990 performance review was a "sham." (Doc. 62, pp. 1–2, 15). In his performance review, Locke gave Ramirez a "4" indicating his performance exceeded the position's requirements and gave plaintiff a "2" indicating plaintiff's performance did not meet all of the position's requirements. (Locke's Depo., Exhibit 8; Ramirez's Depo., Exhibit 3). Plaintiff indicates that he received a "3" rating in 1988 and a "4" rating in 1989. (Doc. 62, pp. 2, 15–16; Locke's Depo., Exhibits 3 & 4). With respect to those reviews and all previous reviews, plaintiff was given a copy of the review, signed it, and was allowed to respond with written comments. (Proposed Pretrial Order, p. 6). However, according to plaintiff, Locke did not follow these standard practices for evaluating performance in his 1990 review, and made no mention of changes in plaintiff's job responsibilities or customer dissatisfaction in his report. (Doc. 62, pp. 2, 15–16). In addition, plaintiff claims that Locke did not take into consideration plaintiff's experience and length of service, as required by the RIF policy. (Doc. 62, pp. 3–4). Plaintiff contends that Unisys had already decided, well before the 1990 performance review was conducted, to terminate him, and Locke's low rating was a result of this predisposition against him. (Proposed Pretrial Order, p. 7).

According to Unisys, Locke's low rating of plaintiff was legitimately based on a number of customer complaints he had received concerning plaintiff's job performance. (Doc. 59, p. 17 n. 9). Unisys contends that, in addition to the previously noted complaints regarding the Lodgistix account, Locke had been informed that plaintiff had refused to pick up orders for a sales representative, been unwilling to allow a major customer, Foxmeyer, to enter into a 24–hour service coverage agreement, mishandled a situation involving the removal and storage of spare parts from Foxmeyer's equipment, and failed to supply information and cooperate with a Unisys sales representative on a bid for a new project. (Doc. 59, p. 17–18 n. 9; Proposed Pretrial Order, pp. 8–9). Plaintiff has disputed these allegations and contends that, during the course of 1990, he was never reprimanded for any of these supposed instances of poor performance. (Doc. 62, p. 16–20; Proposed Pretrial Order, p. 7). Plaintiff points to a number of instances in 1989 and 1990 in which he was commended by a customer.

(Doc. 62, p. 21; Proposed Pretrial Order, pp. 6–7). Locke's written evaluation of plaintiff's performance, dated January 14, 1991, as well as his "staff adjustment analysis," refer to each of the instances cited by Unisys *and* plaintiff and clearly demonstrate that there were considerable differences in business philosophy between Locke and plaintiff. (Locke's Depo., pp. 88–104, Exhibits 8, 11 & 12).

12. According to Unisys, "Locke decided the elimination of Plaintiff's position would least impact the [Wichita] unit's ability to achieve its business objectives." (Doc. 59, p. 15–18). According to plaintiff, Locke's recommendation was actually based on the fact that plaintiff was receiving a higher salary than Ramirez and was nearing early retirement age and entitlement to retirement medical benefits. (Doc. 62, pp. 14–15, 22, 25). In his deposition, Locke states that "[t]he only information [he] used [in determining who to terminate] was a performance analysis of the two managers in Wichita, and nothing else." (Locke's Depo., p. 136). Locke states that although plaintiff's performance was, in some respects, "absolutely outstanding," he had "significant concern about [plaintiff's] management capability and.... ability to make [the] transition from a customer engineer, which he was a very good one, to field service manager, which I don't think he was a very good one." (Locke's Depo., pp. 184, 193). Locke did not have a similar concern with respect to Ramirez. (Locke's Depo., pp. 215–16). Locke "never had a customer complain about Mr. Ramirez," received compliments on Ramirez's performance, and thought Ramirez handled his accounts "exceptionally well." (Locke's Depo., pp. 221, 225). According to Ramirez, Locke gave him the following reasons for the decision to terminate plaintiff:

[H]e liked the way I was running the operation, he liked my management and leadership styles, he thought I could adapt to change rather quickly, he felt that Unisys was going ... through a very difficult time with a lot of changes, a lot of challenges, and he felt that I possessed the skills necessary to help make Unisys successful in those changing times.... [H]e felt that Mr. Babich did not support decisions that he [Mr. Babich] didn't agree with as well as I did.

(Ramirez's Depo., pp. 181–82).

terminated.[13] Although by this time plaintiff's pension rights had vested, plaintiff was only fifty-two years old and still nineteen months away from being eligible to participate in Unisys's ERISA-based "Post–Retirement and Extended Disability Medical Plan." [14] Other employees who had already turned fifty-four at the time of their layoff had the option of choosing voluntary early retirement and participating in this Unisys plan.[15]

After plaintiff's termination, Unisys, pursuant to its RIF policies, provided plaintiff with a standard RIF layoff package, including income assistance benefits. Under Unisys's income assistance plan, plaintiff was eligible to receive one week's worth of income assistance benefits for each full year of service. On this basis, plaintiff could receive income assistance from Unisys until October 8, 1991. However, as indicated in information plaintiff received at the time of his termination, the income assistance benefits would not be paid after plaintiff obtained another "full-time" job.[16] (Plaintiff's Depo., Exhibit 3, p. 14). Plaintiff was provided with a "Notification of Other Employment" form to be utilized in the event he obtained full-time employment.

After his termination, plaintiff sought employment at approximately forty locations. He was eventually hired as a "part-time" Customer Service Manager with a company called Access Services, Incorporated or ASI. ASI's president, Pat Gaughan, was made aware that plaintiff had been terminated in a RIF by Unisys and was still receiving income assistance benefits.[17]

Plaintiff began his "part-time" work with ASI on April 8, 1991. While officially employed "part-time," plaintiff estimates that he worked an average of somewhere between three and four days a week, at least eight hours a day, although neither plaintiff nor Mr. Gaughan is certain how many hours a week were involved. (Plaintiff's Depo., p. 41, 44; Gaughan Depo., p. 39). As with all ASI employees, plaintiff was classified as a "probationary" employee during his first ninety days with ASI and received no employee benefits during that time. In addition, plaintiff had agreed to remain only a part-time employee until company sales improved and the funds for a full-time employee became available. In October 1991, near the time plaintiff's benefits from Unisys were to stop, Gaughan promoted plaintiff to a full-time

**13.** During this meeting, plaintiff inquired as to why he was the Field Service Manager being terminated. He expressed disbelief, discussed his performance reviews, and asked whether the decision had anything to do with some "quota" or "equal opportunity." (Plaintiff's Depo., pp. 244–48).

**14.** At the time of plaintiff's termination, Unisys offered retirement medical benefits to those individuals who retired at the age of 55 and who had ten (10) years of credited service. However, if an employee was terminated pursuant to a RIF, then the employee was entitled to a "bridge" period, so that if the employee was age 54 or older with nine (9) or more years of credited service, then the employee was eligible for the retirement medical benefits. Thus, in the present case, plaintiff would have been eligible to participate in the Unisys plan and receive retirement medical benefits if he had been fifty-four years old at the time of his termination. (Plaintiff had over 30 years of credited service).

**15.** For example, plaintiff submits the affidavit of Donald Wright, a former Burroughs Field Service Manager and Unisys Parts Administrator in Wichita, who states that he volunteered for layoff at age fifty-nine and was able to secure both his pension and retirement medical benefits.

(Wright's Affidavit, p. 5). Interestingly, Wright further states that "[a]t the present time, Unisys has cancelled the retirement medical benefits, effective 1995 or 1996, but there is litigation pending concerning that issue." (Wright's Affidavit, pp. 5–6).

Unisys makes much of the fact that Locke's own position was being eliminated during the time that the decision to terminate plaintiff was being made. (Doc. 59, p. 15 n. 8). However, as plaintiff points out and Unisys readily admits, Locke was *fifty-seven* years old at the time of his layoff and had the option of choosing early retirement, a luxury that was not available to plaintiff. (Doc. 62, p. 14; Doc. 59, p. 15 n. 8).

**16.** Other events could also terminate an employee's entitlement to income assistance payments, but none of those are relevant here. (See Plaintiff's Depo., Exhibit 3, p. 14).

**17.** Underlying the chief dispute between the parties relevant to Unisys's counterclaim is the question of whether Mr. Gaughan knew about the conditions of the severance agreement with Unisys, specifically, that plaintiff's severance payments would terminate if he found other full-time employment. (Doc. 64, p. 4; Doc. 72, p. 3).

position with ASI. Unisys then ceased making income assistance payments. The parties dispute whether there was any relationship between the cessation of income assistance payments from Unisys and Gaughan's decision to promote plaintiff. (Doc. 64, p. 5; Doc. 72, p. 4–5).

## SUMMARY JUDGMENT STANDARDS

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of a moving party who "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Submission of a question to a jury is not required merely because a party having the burden of proof has introduced some evidence.... On the contrary, summary judgment may be granted where the evidence presented by the party opposing summary judgment is not 'significantly probative.'" *Frohmader v. Wayne,* 958 F.2d 1024, 1028–29 (10th Cir.1992) (citing *Anderson,* 477 U.S. at 249–51, 106 S.Ct. at 2510–12). Summary judgment is inappropriate, however, if there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 684 (10th Cir.1991).

The burden of proof at the summary judgment stage is similar to that at trial. "Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who 'fails to make a showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Aldrich Enters., Inc. v. United States,* 938 F.2d 1134, 1138 (10th Cir.1991) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. This burden, however, does not require the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original). Once the moving party properly supports its motion, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514; *Shapolia v. Los Alamos Nat'l Laboratory,* 992 F.2d 1033, 1036 (10th Cir.1993). The court reviews the evidence in a light most favorable to the non-moving party, *e.g., Washington v. Board of Public Utilities,* 939 F.2d 901, 903 (10th Cir.1991), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

## DISCUSSION

### I. *Unisys's Motion for Summary Judgment on ADEA and ERISA Claims*

Plaintiff's ADEA claim is based on the allegation that Unisys's decision to terminate him was impermissibly motivated, at least in part, by plaintiff's age. *See* 29 U.S.C. § 623(a). Plaintiff's ERISA claim is based on section 510 of ERISA, which states in part:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

29 U.S.C. § 1140. Plaintiff specifically alleges that Unisys's decision to discharge him was intended to interfere with his attaining the right to receive ERISA-based retirement

medical benefits upon turning fifty-four years old.[18]

Obviously, there are significant similarities and even overlap between plaintiff's ADEA and ERISA claims. Plaintiff's ADEA claim is predicated on the allegation that Unisys improperly considered his *age* when it decided to discharge him. Plaintiff's ERISA claim is predicated on the allegation that Unisys improperly considered the fact that, because he was nearing the *age* of 54, plaintiff would soon be entitled to early retirement and medical benefits. Thus, both claims hinge on the *age* of the plaintiff and Unisys being improperly motivated thereby.

In a recent opinion, *Hazen Paper Co. v. Biggins*, —— U.S. ——, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), the Supreme Court considered whether an employer has committed age discrimination under the ADEA when the factor motivating its employment decision is not an employee's age, but rather the employee's nearing entitlement to pension benefits. *Id.* —— U.S. at ——, at 1705–08. The Court observed:

> In a disparate treatment case, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision.... Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome.
>
> Disparate treatment, thus defined, captures the essence of what Congress sought to prohibit in the ADEA. It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age.... Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes....
>
> When the employer's decision *is* wholly motivated by factors other than age, the problem of inaccurate and stigmatizing

stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is. Pension plans typically provide that an employee's accrued benefits will become nonforfeitable, or "vested," once the employee completes a certain number of years of service with the employer.... Yet an employee's age is analytically distinct from his years of service.... Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily "age-based."

*Id.* —— U.S. at ——, 113 S.Ct. at 1706–07 (citations omitted).

From this portion of the Court's opinion, it might appear that a case such as the present one involves two distinct determinations of fact: (1) Was the defendant motivated by the plaintiff's age; and (2) Was the defendant motivated by the plaintiff's nearing entitlement to ERISA-based benefits? However, the Court distinguished the present situation as a "special case:"

> [W]e do not consider the special case where an employee is about to vest in pension benefits as a result of his *age,* rather than years of service, ..., and the employer fires the employee in order to prevent vesting. That case is not presented here.

*Id.* —— U.S. at ——, 113 S.Ct. at 1707. The Court found that, in such cases, the employer "may suppose a correlation between" its employee's pension status and age, and, therefore, "[p]ension status may be a proxy for age." *Id.* The Court thus left the door open for ADEA claims that are based on an employer's alleged interference with an employee's entitlement to pension benefits so long as such entitlement is predicated on *age* and not *years of service.* By singling out this type of claim, the Court seems to have suggested that, in these circumstances, an ERISA and an ADEA claim can be established in one fell swoop. That is, applied to the present case, if the plaintiff has present-

---

**18.** It is well settled that "§ 510 [of ERISA] extends to claims by vested employees for intentional interference with their ability to accrue additional benefits." *Conkwright v. Westinghouse Elec. Corp.,* 933 F.2d 231, 238 (4th Cir.1991) (citing numerous authority).

ed sufficient evidence of a section 510 ERISA violation to avoid summary judgment, then that evidence may be sufficient to sustain his ADEA claim as well.[19] Similarly, evidence sufficient to support a section 510 ERISA claim may be equally sufficient to support plaintiff's ADEA claim. Of course, there may be separate, independent evidence to support an ADEA claim—that is, evidence concerning factors relating to the plaintiff's age other than his prospective entitlement to additional ERISA benefits—as well.

■ The *legal* analyses applicable to plaintiff's ADEA and ERISA claims are also similar. The Tenth Circuit has indicated that the Title VII "framework" developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and clarified in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and, more recently, *St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), is to be applied in analyzing a plaintiff's circumstantial evidence supporting an ADEA and/or section 510 ERISA claim.[20] *E.E.O.C. v. Sperry Corp.,* 852 F.2d 503, 507 (10th Cir.1988); *Branson v. Price River Coal Co.,*

853 F.2d 768, 770 (10th Cir.1988) ("Cases brought under the ADEA are subject to the same indirect method of proof used in Title VII cases.") (citing *Schwager v. Sun Oil Co.,* 591 F.2d 58, 60. (10th Cir.1979)); *Phelps v. Field Real Estate Co.,* 991 F.2d 645, 649 (10th Cir.1993) ("In order to establish this intent [to interfere with employee benefits protected by ERISA], the courts have looked to circumstantial evidence surrounding the employment decision because there is rarely direct evidence of wrongful intent.") (citing *Gavalik v. Continental Can Co.,* 812 F.2d 834, 852 (3d Cir.1987), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 and *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1112 (2d Cir.1988), both of which adapt the *McDonnell Douglas/Burdine* framework to a section 510 ERISA claim). The *McDonnell Douglas/Burdine* framework sets up an allocation of the burden of production and an order for the presentation of proof that enables a plaintiff to establish intentional discrimination despite having no *direct* evidence of an employer's motivation. *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2746. It is intended to flush out the true reasons that prompted an employer's action

19. *See Tuck v. Henkel Corp.,* 973 F.2d 371, 376 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1276, 122 L.Ed.2d 671 (1993) (holding that "strong anecdotal evidence that [employer] fires its employees before they reach retirement *age*" in order to "save on retirement benefits" was evidence of age discrimination); *Castleman v. Acme · Boot Co.,* 959 F.2d 1417, 1421 (7th Cir. 1992) (holding that timing of termination of employee, only eight months before he reached early retirement *age,* was evidence of age discrimination); *Reichman v. Bonsignore, Brignati & Mazzotta P.C.,* 818 F.2d 278, 280–81 (2d Cir. 1987) (holding that employer's discharge of employee only ten months before her vested pension benefits would have increased by almost $60,-000—because of her *age*—was evidence of both age discrimination and intentional interference with ERISA benefits). But see also *Visser v. Packer Engineering Assocs., Inc.,* 924 F.2d 655, 658–59 (7th Cir.1991) (citations omitted):

> Age and pension expenses are correlated, though they are not the same thing. There is an analytical difference, certainly, between firing a person on the basis of a stereotyped view of older workers' energy, flexibility, initiative, and other employment attributes, and firing him to save money. Nevertheless a number of cases hold that it is age discrimination to replace an older employee with a younger one

for the sole purpose of economizing on salary costs. But these cases have no application here, because ... there is no circumstantial evidence ... that pension costs played a role in the decision to fire [the plaintiff].... [Plaintiff's] age, the fact that he incurred a loss of pension benefits when he was fired, the fact that he was replaced by a much younger man, ...—none of these facts is evidence of age discrimination.

The Supreme Court's recent opinion in *Hazen Paper* clearly suggests that, when the plaintiff's entitlement to additional ERISA benefits is based on age, the *Visser* holding is wrong, and the fact that plaintiff was nearing such entitlement at the time of his termination · *is* circumstantial evidence of age discrimination. The Seventh Circuit has itself, in fact, distinguished the *Visser* case as involving "overwhelming evidence point[ing] to the fact that the employee was fired for failure to express complete loyalty to the chief executive of his employer." *Castleman,* 959 F.2d at 1421 n. 2.

20. Plaintiff has presented no · *direct* evidence that Unisys violated either the ADEA or section 501 of ERISA, and thus the court need not consider the application of the *Price–Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), "mixed-motive"· framework to this case.

and ensure that the plaintiff has the opportunity to demonstrate that any stated justifications for such action are merely pretexts for discrimination or another illegal motive. *See Burdine,* 450 U.S. at 255–56, 101 S.Ct. at 1094–95.

■ The first step under the *McDonnell Douglas/Burdine* framework is for the plaintiff to establish, by a preponderance of the evidence, a "prima facie" case. *St. Mary's Honor Center,* —— U.S. ——, 113 S.Ct. at 2747. In order to establish a prima facie case under the ADEA, a plaintiff must present evidence from which an intent to discriminate on the basis of age can be inferred. Generally speaking, this involves evidence that the plaintiff was: (1) within the protected age group; (2) adversely affected by the defendant's employment decision; (3) qualified for the position at issue; and (4) replaced by a person outside the protected group. *Branson,* 853 F.2d at 770. However, in RIF cases, the fourth element of the ADEA prima facie case is modified:

> In reduction-in-force cases, plaintiffs are simply laid off and thus [are] incapable of proving actual replacement by a younger employee. Consequently, courts have modified the fourth *prima facie* element by requiring the plaintiff to "produc[e] evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." *See, e.g., Williams v. General Motors Corp.,* 656 F.2d 120, 129 (5th Cir.1981) *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982). This element may be established through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the reduction-in-force. *See, e.g., Thornbrough v. Columbus & Greenville R.R. Co.,* 760 F.2d 633, 643–45 (5th Cir.1985).

*Id.* 853 F.2d at 771; *see also Bingman v. Natkin & Co.,* 937 F.2d 553, 556 (10th Cir. 1991); *Lucas v. Dover Corp., Norris Div.,* 857 F.2d 1397, 1400–01 (10th Cir.1988); *Whitten v. Farmland Industries, Inc.,* 759 F.Supp. 1522, 1532–33 (D.Kan.1991) (O'Connor, J.).

■ In an ERISA section 510 claim, in order to establish a prima facie case, a plaintiff must present evidence from which the employer's *specific* intent to interfere with the plaintiff's entitlement to ERISA benefits can be inferred. *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1223–24 (11th Cir.1993); *Turner v. Schering–Plough Corp.,* 901 F.2d 335, 347–48 (3d Cir.1990); *Dister,* 859 F.2d at 1114–15. "[T]he plaintiff does not have to prove discriminatory intent but must introduce evidence that suggests interference with ERISA rights as a motivating factor." *Clark,* 990 F.2d at 1223–24 (citing *Turner,* 901 F.2d at 348). Ultimately, plaintiff must present some evidence indicating that his loss of ERISA benefits was more than a mere "incidental" result of his termination. *Id.* 990 F.2d at 1224 (citing *Unida v. Levi Strauss & Co.,* 986 F.2d 970, 979 (5th Cir. 1993) and *Conkwright v. Westinghouse Elec. Corp.,* 933 F.2d 231 (4th Cir.1991)). In *Dister v. Continental Group, Inc.,* for example, the plaintiff established a prima facie case under ERISA section 510 by showing that despite being "abundantly qualified for his position," he was discharged only four months before his ERISA-based pension benefits were to vest, resulting in "substantial cost savings" to his employer. 859 F.2d at 1115.

■ If a prima facie case is established, it "creates a presumption that the employer unlawfully discriminated against the employee." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. It then becomes the defendant employer's burden to articulate a "legitimate, nondiscriminatory reason" for the discharge. *Id.* " 'The defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination [or interference with pension rights] was not the cause of the employment action." *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094–95). "The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094.

■ Once the defendant employer has met this burden of production, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant." *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2749 (citing *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094–95). "The presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." *Id.* At this point, the plaintiff has the opportunity to show " 'that the proffered reason was not the true reason for the employment decision' " but was merely a pretext for discrimination. *Id.* —— U.S. at ——, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94).[21] The " 'ultimate question,' " however, remains " 'discrimination *vel non,*' " *id.* —— U.S. at ——, 113 S.Ct. at 2753 (quoting *United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983)), and " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Id.* —— U.S. at ——, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093). That is, even if the plaintiff succeeds in discrediting the defendant's proffered explanation for its employment decision, the "finding that the employer's explanation of its action was not believable" cannot be substituted for "the *required* finding that the employer's action was the product of unlawful discrimination." *Id.* —— U.S. at ——, 113 S.Ct. at 2751 (emphasis added). The employer's proffered reason "cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Id.* —— U.S. at ——, 113 S.Ct. at 2752 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093). "It is not enough, in other words, to *dis*believe the employer; the factfinder must *believe* the plaintiff's ex-

planation of intentional discrimination." *Id.* —— U.S. at ——, 113 S.Ct. at 2754.

Having identified the applicable legal standards, the court now turns to the parties' contentions. Unisys contends that it is entitled to summary judgment on both plaintiff's ERISA claim and plaintiff's ADEA claim because there is no direct or circumstantial evidence that plaintiff's age or his anticipated rights to additional ERISA benefits played any role in Unisys's decision to terminate him and, therefore, plaintiff cannot establish a prima facie case under either ERISA or the ADEA. (Doc. 59, pp. 23–27, 36–38). Unisys further contends that, even if plaintiff could establish a prima facie case, Unisys has articulated a legitimate, nondiscriminatory reason for plaintiff's termination, namely, that plaintiff's discharge had less impact on Unisys's business in Wichita than would have resulted from the termination of Ramirez. (Doc. 59, pp. 27–28, 38). According to Unisys, plaintiff has failed to present evidence sufficient to raise a genuine question of material fact concerning whether Unisys's proffered explanation is pretextual. (Doc. 59, pp. 28–35, 39).

Plaintiff counters by asserting that the circumstantial evidence of this case *is* enough to present a prima facie case under both ERISA and the ADEA. According to plaintiff, the termination of a qualified and experienced employee shortly before he becomes entitled to additional ERISA benefits suggests that the termination was improperly motivated. (Doc. 62, pp. 40–41). Plaintiff claims that he will demonstrate Unisys had a pattern of terminating employees in such circumstances and saved millions of dollars thereby. (Doc. 62, p. 42). With respect to his ADEA claim, plaintiff argues that he has established each of the elements of a prima facie case. (Doc. 62, p. 26–29). According to plaintiff, the circumstantial evidence—specifically, that plaintiff was terminated in favor of a younger employee with less management

---

**21.** According to dicta in the *Burdine* decision, the plaintiff can succeed in proving intentional discrimination "either *directly* by persuading the court that a discriminatory reason more likely motivated the employer or *indirectly* by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. In *St. Mary's Honor Center,*

Justice Scalia identified this dicta as inconsistent with other statements in *Burdine* and declared that it "must be regarded as an inadvertence, to the extent that it describes disproof of the defendant's reason as a totally independent, rather than an auxiliary, means of proving unlawful intent." *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2753.

experience and that Unisys failed to follow "significant portions" of its RIF policy—gives rise to a presumption of unlawful discrimination. (Doc. 62, pp. 27–29). Plaintiff further argues, in the face of Unisys's proffered explanation for his termination, that he has raised a "triable issue of pretext." (Doc. 62, pp. 29–39).

## A. Plaintiff's Prima Facie Case

 The court agrees with plaintiff that he has presented a prima facie case under both the ADEA and section 510 of ERISA. The circumstances under which plaintiff was discharged give rise to an inference of intent on the part of Unisys to both unlawfully discriminate against plaintiff and interfere with his future attainment of the right to retirement medical benefits. Plaintiff has demonstrated that he was a well-qualified, experienced employee whose services to Unisys had earned him and Unisys considerable praise from Unisys customers.[22] Unisys's discharge of such an employee within two years of his attaining pension rights *in itself* suggests that plaintiff's anticipated entitlement to retirement medical benefits was possibly a motivating factor in Unisys's termination decision, even though the resulting amount of "cost savings" to Unisys is unclear. *See Dister*, 859 F.2d at 1115. With respect to the ADEA claim, because plaintiff's age, not his years of service, was the reason plaintiff was not eligible for retirement medical benefits at termination, it necessarily follows that the plaintiff's age was likewise a possible motivating factor. *See* discussion *supra*. Moreover, the court finds that the *circumstantial* evidence shows plaintiff was (1) within the protected age group (i.e., over 40), (2) adversely affected by Unisys's decision to terminate him, (3) qualified for the position of Field Service Manager, and (4) treated less favorably than a younger employee, Phil Ramirez, during Unisys's reduction-in-force. *Branson*, 853 F.2d

at 770–71. Unisys's arguments to the contrary are unavailing.

Unisys generally argues that the only evidence plaintiff has offered to meet his prima facie burden is that he, at age 52, was laid off and Mr. Ramirez, at age 38, was retained. (Doc. 71, p. 2). That, however, mischaracterizes plaintiff's case. Plaintiff has not only presented evidence of his and Ramirez's respective ages, but also of his and Ramirez's employment histories and qualifications. Furthermore, as discussed *supra*, the evidence shows that plaintiff was only nineteen months away from being entitled to retirement medical benefits at the time of his termination. Together, this evidence is enough to give rise to an inference that Unisys unlawfully discriminated against plaintiff and intentionally interfered with his entitlement to ERISA benefits.

Unisys specifically argues that plaintiff has not established a prima facie case under the ADEA because he has not presented evidence that he was treated less favorably than a younger employee during the reduction-in-force. According to Unisys, "[i]t is well-settled that to raise an inference of age discrimination in the context of a reduction-in-force case based upon the retention of a younger employee, [p]laintiff must establish that the younger employee was retained in a 'similar position.'" (Doc. 71, p. 3). Unisys contends that the evidence in this case shows Ramirez was not retained in a position similar to plaintiff's. That is, Unisys contends that it eliminated a position, not an employee, and it therefore cannot be guilty of unlawful discrimination. (Doc. 59, pp. 25–26; Doc. 71, pp. 2–10).

The court rejects Unisys's "similar position" argument for two reasons. First, the court finds sufficient evidence that Ramirez did *in effect* replace plaintiff and take over his position. In *Bingman v. Natkin & Co.*, 937 F.2d 553 (10th Cir.1991),[23] the Tenth

---

**22.** Unisys's criticisms of plaintiff's performance "go to the weight of the evidence of satisfactory performance, not [plaintiff's] initial burden to produce such evidence. Clearly, [plaintiff] met his burden of production by introducing some evidence of good performance." *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1420 (10th Cir.1991) (discussing *Powell v. Syracuse*

*University*, 580 F.2d 1150, 1155 (2d Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978)).

**23.** The only authority Unisys cites for its supposedly well settled "similar position" rule is two federal district cases from New York: *Wolfe v. Time, Inc.*, 702 F.Supp. 1045 (S.D.N.Y.1989) and

Circuit considered whether there was sufficient evidence for a jury to find for an ADEA plaintiff whose position as a forklift operator had supposedly been "eliminated" in a reduction-in-forces. The court found that, even though the defendant's witnesses verified that plaintiff's job had simply been "eliminated" and that "others in the work force simply took over the few 'forklift' duties that came up after plaintiff was terminated," the jury could find that the plaintiff's position had not been eliminated but instead "had been taken over and assumed by younger men." *Id.* at 556. The jury could similarly find, in the present case, that plaintiff's old duties have been "taken over and assumed by" a younger employee, Ramirez. In fact, with respect to plaintiff's duties over the Lodgistix account, a "selection for layoff" memorandum prepared by Mr. Locke clearly contemplates that Ramirez would take over "the part-time duty of project manager at Lodgistix Corporation currently handled by [plaintiff]." (Locke's Depo., Exhibits 11 & 12).

Second, the court finds Unisys's "similar position" argument highly disingenuous. The evidence clearly shows that, in making the decision to terminate plaintiff, Unisys considered retaining both plaintiff and Ramirez for the Field Service Manager position, and it chose Ramirez over plaintiff. Locke's "selection for layoff" memorandum and "staff adjustment analysis" compare the respective performances and abilities of Ramirez and plaintiff, not their supposedly distinct functions, to determine which employee, not which position, should be eliminated. (Locke's Deposition, Exhibits 11 & 13). In the court's view, an employer which considers two qualified individuals for a position and which then chooses one over the other solely on the basis of age is plainly guilty of unlawful discrimination. Indeed, if Unisys has done so in the present case, there can be no question that it has violated the ADEA. Its argument to the contrary is without merit.

### B. *Defendant's Nondiscriminatory Reasons*

■ Having found that plaintiff has presented sufficient evidence to give rise to an inference of intentional discrimination and interference with entitlement to ERISA benefits, the burden shifts to Unisys to articulate a legitimate, nondiscriminatory reason for its employment decision. Unisys' proffered explanation is as follows: In accordance with its RIF policy, plaintiff was selected for termination instead of Ramirez because plaintiff's termination would, overall, have less of an impact on the Wichita area business unit's achieving its business objectives.

This explanation is both plausible and supported by the evidence. In the abstract, it simply makes sense for an employer, during a RIF, to terminate those employees whose discharge will least affect business. The evidence strongly suggests that the discharge of plaintiff, rather than Ramirez, was less likely to have a deleterious effect on the Wichita office achieving its business objectives. Although both Ramirez and plaintiff executed important functions, Ramirez clearly appears to have been an excellent employee whose presence was more essential to the overall performance of the Wichita office. At the time of the selection process, Ramirez was in charge of daily operations and supervised all customer service engineers. Plaintiff occasionally filled in for Ramirez, but his main duties were handling "escalated issues" and the Lodgistix account. Although there is considerable dispute concerning plaintiff's performance of his duties as Field Service and Field Support Manager, there is little dispute that Ramirez performed his duties quite well. Ramirez's 1990 performance review indicates his performance in the areas of finances, customer satisfaction, operations, and LOB support was exceptional and that he "exceeded the position requirements in most key areas." (Ramirez's Depo., Exhibit 3). Locke's "selection for layoff" memorandum commends Ramirez for his leadership, professionalism, innovativeness, experience, and overall management skills. (Locke's

*Schweizer v. Strippit/Di–Arco–Houdaille, Inc.*, 1988 WL 32214 (W.D.N.Y.1988). (Doc. 71, p. 3). These cases have no precedential value in this court. The court's review of Tenth Circuit prece-

dent, nevertheless, reveals that a type of "similar position" rule has been applied by this circuit in cases such as *Bingman*.

Depo., Exhibits 11 & 12). In short, there is considerable evidentiary support for Unisys's position that Ramirez's termination would have caused more significant negative repercussions to the Wichita unit's business than plaintiff's termination.

## C. *Plaintiff's Evidence of Pretext*

Because Unisys has articulated a legitimate, nondiscriminatory explanation for its decision to terminate plaintiff, the prima facie presumption of intentional discrimination and interference with ERISA benefits "drops out of the picture." *St. Mary's Honor Center*, — U.S. at —, 113 S.Ct. at 2749. Plaintiff has the opportunity to show that Unisys's proffered explanation is merely a pretext for discrimination. Plaintiff's evidence of pretext "may, along with the elements of the prima facie case, suffice to show intentional discrimination." *Id.*

In responding to Unisys's proffered explanation, plaintiff asserts that "while Unisys claims a reduction-in-force, [it] actually asserts that plaintiff's alleged declining job performance justified the decision." (Doc. 62, p. 29). Plaintiff points to his experience and technical abilities, Ramirez's lack thereof, and Unisys's failure to follow its own RIF policies as evidence sufficient to " 'raise a triable issue of pretext.' " (Doc. 62, pp. 29–30) (quoting *Montana v. First Fed. Sav. and Loan of Rochester*, 869 F.2d 100, 105 (2d Cir.1989), which is cited by Judge O'Connor in *Whitten*, 759 F.Supp. at 1534). Plaintiff attempts to explain away each of Locke's criticisms of his performance and asserts that "[t]here is certainly evidence in this case that Unisys contrived reasons after the fact to justify plaintiff's termination." (Doc. 62, p. 37). Plaintiff requests that the court " 'look behind [Unisys's] claim that it merely exercised a business decision in good faith' and permit [him] to 'show that [Unisys] acted in an illegitimate or arbitrary manner.' " (Doc. 62, p. 39) (quoting *Montana*, 869 F.2d at 106).

After closely examining plaintiff's evidence of pretext, the court concludes that plaintiff should be given the opportunity to prove in court that Unisys's decision to terminate him was actually motivated, at least in part, by considerations of plaintiff's age and anticipated entitlement to retirement medical benefits. Plaintiff has attacked the justifications underlying Locke's finding that his termination would have less of an impact on the Wichita office's business. Locke's "selection for layoff" memorandum, which was prepared contemporaneously with plaintiff's termination, discusses: (1) Ramirez's comparatively "stronger proven management skills and abilities;" (2) Ramirez's and plaintiff's respective "duties;" (3) Ramirez having greater experience with the larger 220 and A17 accounts; and (4) specific instances of poor performance on the part of plaintiff. (Locke's Depo., Exhibits 11 & 12). Plaintiff has submitted evidence, in the form of deposition testimony and affidavits, casting doubt on all four of these justifications. (Doc. 62, pp. 30–35; Plaintiff's Depo.; Plaintiff's Affidavit; Davis Affidavit; Wright Affidavit; Patton Affidavit; Everton Affidavit; Nye Affidavit; Dyer Affidavit). Plaintiff has also produced evidence that Unisys did not follow its own RIF policies in evaluating plaintiff individually and vis-a-vis Ramirez. (Doc. 62, pp. 15–16, 35–36). All of this evidence, coupled with the timing of plaintiff's discharge, contributes to plaintiff's theory that Unisys has conjured up excuses for its decision to terminate plaintiff when the real reason was plaintiff's age. The court is highly skeptical about the chances that a jury will buy into plaintiff's theory. Nevertheless, the court finds that a jury *might* do so. That is, in the court's view, plaintiff's evidence of pretext *"may*, along with the elements of the prima facie case, suffice to show intentional discrimination." *St. Mary's Honor Center*, — U.S. at —, 113 S.Ct. at 2749 (emphasis added).

Unisys argues that plaintiff has presented no evidence that plaintiff's termination had a greater impact than Ramirez's would have or that Ramirez's termination would have had a lesser impact than plaintiff's did. The court disagrees. By casting doubt on the justifications underlying Locke's determination that plaintiff's discharge would have a lesser impact on business, plaintiff has called into question Unisys's proffered explanation. Plaintiff has not directly shown how Ramirez, whose responsibilities included the day-to-

day operations of the Wichita office and whose past performance is relatively unchallenged, was less valuable to the Wichita office than plaintiff. The court finds that plaintiff has, nevertheless, presented evidence to show that Locke's criticisms of his performance and comparisons of him and Ramirez were inaccurate. The court is not "second-guess[ing] an employer's business judgment." *Branson*, 853 F.2d at 772. The court merely concludes that plaintiff's challenges of Unisys's decisionmaking process are sufficiently specific and meritorious to raise an issue of fact as to whether plaintiff's age or other impermissible factors were involved. *Fallis v. Kerr–McGee Corp.*, 944 F.2d 743, 747 (10th Cir.1991) (citing *Branson*) ("[A] plaintiff cannot prevail by merely challenging in *general* terms the accuracy of a performance evaluation which the employer relied on in making an employment decision....") *Id.* Plaintiff's evidence can be described as minimal at best. A jury could, nonetheless, based on this evidence, disbelieve Unisys's articulated reason for its employment decision and believe the plaintiff's allegations of intentional discrimination. *St. Mary's Honor Center*, ___ U.S. ___, 113 S.Ct. at 2754. Unisys's motion for summary judgment must accordingly be denied.

## II. *Plaintiff's Motion for Summary Judgment*

 Plaintiff moves the court for an order granting him summary judgment on Unisys's counterclaim for breach of contract and recoupment of income assistance benefits previously paid to plaintiff. Plaintiff submits two independent grounds for summary judgment: (1) Unisys has presented no evidence that plaintiff was both working "full-time" and receiving income assistance benefits in violation of Unisys's Income Assistance and Benefit Plan; and (2) the doctrine of equitable estoppel bars Unisys's claim for recoupment because plaintiff honestly and reasonably relied on the term "full-time" in the Unisys plan as indicating that, in accepting a part-time position with ASI, he could still receive income assistance and did not have to hold out for a full-time job. (Doc. 64, pp. 9–16).

In response, Unisys asserts that "there are genuine issues of material fact related to [its] counterclaim for breach of contract that preclude summary judgment." (Doc. 74, p. 1). Unisys contends that the term "full-time" in the Unisys plan is ambiguous and that the meaning to be attributed to that term is a *question of fact for the jury*. (Doc. 74, pp. 9–13). Unisys characterizes plaintiff's equitable estoppel defense as "preposterous" and "ludicrous" because Unisys never induced plaintiff's act in supposed reliance on the Unisys plan. (Doc. 74, pp. 13–14).

The court agrees with Unisys that plaintiff's equitable estoppel defense is fundamentally unsound. The court is skeptical of Unisys' contention that the term "full-time" employment is ambiguous, but assuming that it is, the court does not believe it is either necessary or wise to have the jury interpret what "full-time" employment means. One of the most basic rules of contract law is that an ambiguous provision is to be resolved against the party who drafted that provision. *Helitzer v. Helitzer*, 761 F.2d 582 (10th Cir.1985) (applying Kansas law); *Thomas v. Thomas*, 250 Kan. 235, 824 P.2d 971 (1992). "Since one who speaks or writes can, by exactness of expression, more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from the ambiguity of language are resolved against the former and in favor of the latter." *Smith v. Russ*, 184 Kan. 773, 779, 339 P.2d 286 (1959). This rule is particularly relevant when, as in the present case, the party against whom the ambiguous language is being asserted is in a disadvantageous bargaining position vis-a-vis the other party. *United States v. Kansas Gas & Elec. Co.*, 215 F.Supp. 532 (D.Kan.1963).

Applying this rule of strict construction to the Unisys income assistance and benefits plan at issue in the present case, the court finds that the term "full-time" should be given a meaning of forty hours per week which, there can be little question, is the ordinary meaning currently given to it. Neither this judge nor a jury in this court is going to get into the business of splitting hairs over whether, for example, working thirty-five hours per week constitutes "full-time" employment. Unisys had the chance

to make the meaning of the term "full-time" unquestionably clear by specifically defining it in the Unisys plan. Indeed, Unisys had the duty to do so since it knew that the issue of continued benefits to its laid-off employees could depend on the meaning of the words "full-time." One might speculate whether Unisys' failure to define "full-time" was inadvertent or intentional but it is not necessary for purposes of decision. All that is necessary is the fact that Unisys failed to do so. It made its bed and must lie therein.

Hence, finding no concrete evidence that plaintiff ever worked more than forty hours per week during the time he was officially employed "part-time" with ASI, the court grants plaintiff's motion for summary judgment on the grounds that, because he was not employed "full-time" within the meaning of Unisys's income assistance and benefits plan, he was entitled to receive income assistance benefits thereunder.

**IT IS ACCORDINGLY ORDERED** that defendant Unisys Corporation's motion to dismiss or for summary judgment is hereby denied. Plaintiff J. David Babich's motions for summary judgment is hereby granted.

IT IS SO ORDERED.