James M. KULINSKI, Appellee,

v.

MEDTRONIC BIO–MEDICUS, INC., Appellant.

James M. KULINSKI, Appellant,

v.

MEDTRONIC BIO–MEDICUS, INC., Appellee.

Nos. 93–1186, 93–1187.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 15, 1993.

Decided April 8, 1994.

Jeff Keyes (argued), Minneapolis, MN (Jay W. Schlosser, on the brief), for appellant.

Stephen P. Kelley (argued), Minneapolis, MN (Michael C. Glover, on the brief), for appellee.

Before McMILLIAN, Circuit Judge, LAY, Senior Circuit Judge, and BOWMAN, Circuit Judge.

BOWMAN, Circuit Judge.

James Kulinski sued Medtronic Bio–Medicus, Inc., claiming the company was obligated to pay him in accordance with his change-of-control-termination agreement (CCTA), otherwise known as a "golden parachute." Jurisdiction in the District Court was based on

ERISA,[1] and the case was tried and decided as though it was governed by ERISA. Judgment was entered in Kulinski's favor. This appeal by the employer and cross-appeal by Kulinski followed. Because the evidence fails to show the existence of an ERISA plan, however, ERISA does not govern this dispute. Federal subject matter jurisdiction therefore is lacking. Accordingly, the appeal and the cross-appeal must be dismissed, the judgment and orders of the District Court must be vacated, and the complaint must be dismissed.

## I.

In April 1986, the board of Bio–Medicus, Inc., authorized the execution of CCTAs with various executives. In January 1990, Kulinski, Bio–Medicus's National Sales Manager, entered into such an agreement with the company. Kulinski's CCTA was signed on behalf of Bio–Medicus by James Lyons, the company's president and chief executive officer, but the agreement never was presented to Bio–Medicus's board for approval.

The CCTA provided that Bio–Medicus would pay Kulinski a sum equal to 2.99 times his annual compensation in the event he was terminated, or for good reason resigned, within one year of a hostile takeover. It also gave Kulinski the sole discretion to decide whether he had one of the "good reasons" for resigning listed in the agreement. In the event the agreement's protections were invoked, Bio–Medicus was required to pay Kulinski the lump sum due him within thirty days. Aside from scattered definitional references to federal statutory provisions, the CCTA was entirely self-contained—it included no references to any outside criteria or standards or to any board resolutions.

In May 1990, Bio–Medicus was engaged in friendly merger negotiations with Medtronic, Inc. That month, Bio–Medicus's board authorized a revision to the CCTAs; the new CCTAs were identical to the old, except they applied to terminations following a friendly merger, as well as to those following a hostile takeover. Pursuant to the May 1990 board resolution, these new agreements were executed with executives who previously had CCTAs. Lyons on behalf of Bio–Medicus and Kulinski signed such a new CCTA in June 1990. Lyons's action in that regard may have exceeded his authority, as later that month, the board considered whether it should extend the new CCTA to Kulinski, and it declined to do so. Although Kulinski was not informed at that time of the board's actions, he was advised that "there may have been problems" with his CCTA. He was told explicitly in a September 1990 letter from Lyons that the company was not going to honor this new agreement.

In September 1990, Bio–Medicus merged with Medtronic to form Medtronic Bio–Medicus, Inc. (hereinafter Medtronic). Later that month, after being offered what he believed was a diminished compensation package and position with Medtronic, Kulinski resigned. He then demanded payment pursuant to his January 1990 CCTA.

Medtronic refused to pay, claiming that, based on certain criteria listed in the minutes from Bio–Medicus's board and board-committee meetings, Kulinski was not eligible for a CCTA. Specifically, Medtronic claimed that Kulinski was not a "top executive[ ], at the level of director or above," as stated in the minutes of the board's April 1986 meeting, Appendix for Appellant at A–9, and that Kulinski's agreement had not been "approved by the Board," a requirement specified in the minutes of an earlier meeting of the compensation committee, *id.* at A–2, which had recommended the CCTAs to the board.

Kulinski then brought suit in the District Court for the benefits he claimed were due him pursuant to his January 1990 CCTA, which, as previously mentioned, applied only to hostile takeovers. For reasons not entirely apparent to us, he did not seek recovery based upon his June 1990 CCTA, which applied to friendly takeovers as well as to hostile ones. Jurisdiction in the District Court

---

**1.** The Employee Retirement Income Security Act, 29 U.S.C. 1001–1461 (1988 & Supp. IV 1992).

was based on ERISA under 29 U.S.C. § 1132(e) (1988).

Both parties treated the case as an ERISA case, a characterization the District Court accepted without critical examination. As framed by the parties, the dispute centered over which board meeting and board-committee meeting minutes were part of the ERISA plan and whether Kulinski had met the requirements listed in those portions that were. Medtronic also argued the fairly obvious point that the CCTA Kulinski was seeking to enforce applied only to hostile takeovers, not friendly ones.

After a bench trial, the District Court ruled that Kulinski had a valid claim based on the ERISA plan the court found to exist. The court awarded Kulinski $254,556 in severance pay (2.99 times his annual compensation), plus attorney fees, costs, and prejudgment interest. Medtronic's post-trial motions were denied, and Medtronic appeals. Kulinski cross-appeals the District Court's denial of his request for the attorney fees he incurred defending against Medtronic's post-trial motions.

## II.

ERISA defines an employee benefit plan as "an employee welfare benefit plan or an employee pension benefit plan," 29 U.S.C. § 1002(3) (1988), and an "employee welfare benefit plan" as "any plan, fund, or program . . . established or maintained . . . for the purpose of providing for its participants [specified] benefit[s]," *id.* § 1002(1). Such benefits include severance benefits. *Wallace v. Firestone Tire & Rubber Co.*, 882 F.2d 1327, 1329 (8th Cir.1989).

■ Where federal subject matter jurisdiction is based on ERISA, but the evidence fails to establish the existence of an ERISA plan, the claim must be dismissed for lack of subject matter jurisdiction. *Harris v. Arkansas Book Co.*, 794 F.2d 358, 360 (8th Cir.1986) ("The existence of a plan is a prerequisite to jurisdiction under ERISA."); *Jader v. Principal Mut. Life Ins. Co.*, 925 F.2d 1075, 1076–77 (8th Cir.1991) (remanding for determination of whether jurisdiction was lacking because there was no ERISA plan);

*accord UIU Severance Pay Trust Fund v. Local 18–U*, 998 F.2d 509, 510 & n. 2 (7th Cir.1993) ("the existence of an 'ERISA-governed plan' is an essential precursor to federal jurisdiction"); *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 240 (5th Cir.1990) (stating that the question of whether an ERISA plan existed was "a jurisdictional one"). Other courts have elected to treat the existence or non-existence of an ERISA plan as going to the merits of the claim rather than to jurisdiction. *See, e.g., Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Employees*, 974 F.2d 391, 397–98 (3d Cir.1992); *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 573 (5th Cir. 1980). Under the law of our Circuit, however, the question is jurisdictional, and if we do not find jurisdiction, we may not consider the merits of Kulinski's claim. *See Jader*, 925 F.2d at 1077.

■ The existence of an ERISA plan is a mixed question of fact and law that on appeal we review de novo. *See, e.g., Harris*, 794 F.2d at 360; *accord Custer v. Pan American Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir.1993); *Peckham v. Gem State Mut. of Utah*, 964 F.2d 1043, 1047 & n. 5 (10th Cir.1992). We note that some circuits consider this question to be one of fact, and thus subject to review under the clearly erroneous standard. *See, e.g., Deibler v. United Food and Commercial Workers' Local Union 23*, 973 F.2d 206, 209–10 (3d Cir.1992); *see also Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1082 (1st Cir.), *cert. denied*, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990); *Kanne v. Connecticut Gen. Life Ins. Co.*, 867 F.2d 489, 492 (9th Cir.1988) (per curiam), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989). Based on the law of our Circuit (which we believe to be the better view in any event), we apply the de novo standard of review in this case.

■ An employer's decision to extend benefits does not constitute, in and of itself, the establishment of an ERISA plan. *Wells v. General Motors Corp.*, 881 F.2d 166, 176 (5th Cir.1989), *cert. denied*, 495 U.S. 923, 110 S.Ct. 1959, 109 L.Ed.2d 321 (1990). Instead, *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), and its

progeny have delineated the standard to be applied to determine whether a benefits plan falls within ERISA's ambit: The pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits. Simple or mechanical determinations do not necessarily require the establishment of such an administrative scheme; rather, an employer's need to create an administrative system may arise where the employer, to determine the employees' eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria.

■ In *Fort Halifax*, the Supreme Court was asked to determine whether a Maine statute established a plan within the meaning of, and thus was preempted by, ERISA. *Id.* at 3–4, 107 S.Ct. at 2213–14. The statute required employers that closed or relocated certain plants to provide a one-time, lumpsum severance payment to each employee, one week's pay for each year of employment. *Id.* at 4 n. 1 & 5, 107 S.Ct. at 2213–15 n. 1 & 5. Severance payments were not required, however, if the employee had been employed for less than three years, was covered by an express contract that provided severance pay, or, in the event the plant was relocated, accepted employment at the new location. *Id.*

The Supreme Court held that ERISA did not preempt the statute, reasoning that:

> The Maine statute neither establishes, nor requires an employer to maintain, an employee benefit *plan*. The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well *never* have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set

of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

*Id.* at 12, 107 S.Ct. at 2218 (footnote omitted).

Various cases decided since *Fort Halifax* have used its touchstone of whether an administrative plan is required to determine whether an ERISA plan exists. In *Fontenot v. NL Industries, Inc.*, 953 F.2d 960, 962 (5th Cir.1992), for example, the Fifth Circuit applied *Fort Halifax*'s reasoning to a golden parachute that is quite similar to the one before us in this case. In *Fontenot*, the company's plan provided that, if an executive was terminated within two years of a change of control, the company would continue certain benefits for three years and also pay the executive a lump-sum payment of three times the highest compensation the executive had earned during the three previous years. *Fontenot*, 953 F.2d at 961. The court, relying on *Fort Halifax* and *Wells*, 881 F.2d at 175–76, held that the one-time lump-sum payment mandated by the severance plan did not require an ongoing administrative scheme. *Fontenot*, 953 F.2d at 962. The court noted that the covered employees were to receive a severance payment regardless of the reason for the termination. *Id.* at 963.

Similarly, in *Angst v. Mack Trucks, Inc.*, the employees claimed that the company had failed to honor its buyout plan, under which the company had agreed to pay employees $75,000 and a year of continued benefits in exchange for their voluntary departures. 969 F.2d 1530, 1532, 1533 (3d Cir.1992). The court held that the buyout plan did not constitute an ERISA plan because the severance benefits did not require the creation of a separate and ongoing administrative scheme. *Id.* at 1538–39.

The *Angst* court distinguished *Pane v. RCA Corp.*, 868 F.2d 631, 635 (3d Cir.1989), in which the court had concluded that a golden parachute was an ERISA plan be-

cause it required an administrative scheme. The *Angst* court reasoned that the plan in *Pane* required the employer to create "an administrative apparatus that would analyze each employees' [sic] situation in light of particular criteria." *Angst,* 969 F.2d at 1539. In *Pane,* the employee was eligible for benefits under the plan only in the event of a specified triggering event, such as a termination without cause. *Pane v. RCA Corp.,* 667 F.Supp. 168, 170–71 (D.N.J.1987), *aff'd,* 868 F.2d 631 (3d Cir.1989).

A short discussion of two cases on the other side of the existence-of-an-ERISA-plan fence further demonstrates the application of the *Fort Halifax* standard. In *Bogue v. Ampex Corp.,* a company that was contemplating the sale of a subsidiary established a severance pay plan to induce the subsidiary's executives to remain; in the event the subsidiary was sold, the company promised to pay severance benefits to executives who were not offered "substantially equivalent employment," which meant that the new position's responsibilities were not similar to those of the old, by either the company or the subsidiary's purchaser. 976 F.2d 1319, 1321 (9th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1847, 123 L.Ed.2d 471 (1993). Because this criterion had to be applied on a case-by-case basis, "the program, by its own terms, required the sort of discretionary decision-making by the plan's administrator that is the hallmark of an ERISA plan," and the plan could not be managed without an administrative scheme for dealing with claims of entitlement to the promised benefits. *Id.* at 1322–23. The court accordingly concluded that the plan was one governed by ERISA.

In *Simas v. Quaker Fabric Corp. of Fall River,* Massachusetts had enacted a statute that required employers to make substantial severance payments to employees with three or more years of employment who lost their jobs within two years of a corporate change of control. 6 F.3d 849, 851 (1st Cir.1993). The statute required graduated payments for employees based on their individual lengths of service, and it applied only to employees who would be eligible for unemployment compensation, bringing yet other statutory requirements into play. *Id.* at 852–53. The court held there was an ERISA plan because the statute required the establishment of an ongoing administrative scheme for determining employee eligibility. *Id.* at 853. The *Simas* court noted that, as in *Bogue,* the relevant time period was prolonged, individualized decisions were required, and there was at least one criterion the application of which was far from mechanical. *Id.* at 854.

To determine whether an ERISA plan exists in this case, this Court must ask whether Bio–Medicus's plan to enter into CCTAs with various of its executives required the establishment of a separate, ongoing administrative scheme to administer the promised benefits. The application of this standard to the facts of this case conclusively demonstrates there is no ERISA plan here. Kulinski's agreement with Bio–Medicus provided that he was to receive severance benefits if terminated within one year of a hostile takeover. He also was to receive benefits if, within the same period, he resigned for good reason, and the agreement explicitly gave him the unfettered discretion to decide whether good reason existed. Simply put, once a hostile takeover occurred and Kulinski resigned his employment for what he regarded as a good reason, there was nothing for the company to decide, no discretion for it to exercise, and nothing for it to do but write a check. The "plan" contemplated nothing more. Because such a simple mechanical task does not require the establishment of an administrative scheme, Bio–Medicus's plan to provide golden parachutes for its executives was not an ERISA plan.

### III.

Kulinski bases his claim solely on ERISA. Jurisdiction likewise is asserted only on the basis of ERISA. Because there is no ERISA plan here, this is not an ERISA case, and federal subject matter jurisdiction is absent. Accordingly, we dismiss the appeal and the cross-appeal, vacate the judgment and orders of the District Court, and remand with instructions that the complaint be dismissed.