C. James **HERRING**, Plaintiff,

v.

**OAK PARK BANK**, et al., **Defendants.**

No. 95–2623.

United States District Court,
D. Kansas.

April 4, 1997.

As Amended May 9, 1997.

---

Lawrence L. Ferree, III, Ferree, Bunn & O'Grady, Chtd., Overland Park, KS, C. Joseph Yast, Law Office of C. Joseph Yast, Northfield, IL, for C. James Herring.

Charles W. German, Brant M. Laue, William D. Beil, Rouse, Hendricks, German, May & Shank, Kansas City, MO, for Oak Park Bank, Hillcrest Bank, Olathe Bank, Jack N. Fingersh, Irwin J. Blitt and Lewis White.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

By this action, plaintiff alleges that defendants terminated his employment for the purpose of interfering with his rights under his "phantom stock" plan, in violation of section 510 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1140. Plaintiff has also brought a common law civil conspiracy claim, alleging that the individual defendants conspired to violate section 510. The matter is presently before the court on defendants' motion for summary judgment (Doc. 52) and defendants' motion to strike plaintiff's demand for a jury trial and to strike plaintiff's punitive damages claim (Doc. 51). For the reasons set forth below, the court grants defendants' motion for summary judgment. The summary judgment obviates consideration of the jury trial and punitive damages issues, and defendants' other motion is therefore denied as moot.

### I.  Facts [1]

Defendants Oak Park Bank, Hillcrest Bank, and The Olathe Bank are privately owned by three family groups. Individual defendants Jack Fingersh, Irwin Blitt, and Lewis White are active owners and serve as directors for the banks.

In July of 1993, defendants hired plaintiff to act as CEO, Chairman of the Board, and Director for each of the three banks, and as President of Oak Park Bank. Defendants had terminated plaintiff Is predecessor because of concerns about his judgment with regard to commercial lending and because two of the banks had encountered regulatory difficulties, coming under FDIC Memoranda of Understanding (MOUs).

As part of plaintiff's compensation, the parties instituted a "Deferred Compensation Plan and Agreement" (the Agreement). The Agreement took effect when plaintiff began his employment, although plaintiff did not sign it until May of 1994. The Agreement expressed the following purpose:

> The purpose of the Deferred Compensation Plan described in this Agreement (the "Plan") is to provide an additional incentive to [plaintiff] to remain in the employ of the banks and to provide to [plaintiff] an opportunity to receive additional compensation for his contribution to the long-term financial success of the Banks.

The Agreement set out a "phantom stock" plan. The theory behind the plan was that

---

**1.** In accordance with the applicable summary judgment standard, the facts are uncontroverted or related in the light most favorable to plaintiff.

plaintiff would "purchase" a phantom interest in the banks for $337,870, which amount would be financed entirely by the banks. The concept was effected by crediting an account each year with a percentage of the banks' profit, less plaintiff's "carrying cost" (the payment on the cost of his interest—the prime rate times $337,870). The Agreement contained the following provision concerning plaintiff's account:

> The Banks will jointly establish the Account for [plaintiff] to which amounts awarded under the Plan will be credited. An account ledger will be established as an appropriate record and from time to time, but no less than annually based on the December 31 year end financial statements, the Banks will enter in such account ledger [the appropriate credits].

The Agreement further provided that the banks' boards would adjust the account "[p]romptly after the completion of the Banks' financial statements as of the end of each Plan Year." The plan vested fully after five years; on January 1, 1994, the plan became 40 percent vested. The Agreement expressly made the amounts credited to plaintiff's account an unfunded liability.

Plaintiff would be paid under the Agreement upon the occurrence of one of seven "events of payment". Upon death or disability of plaintiff or the sale or dissolution of the banks, plaintiff would receive, as a lump sum payment, the amount in the account that had vested. If plaintiff retired, he would receive the vested amount over a 13–month period. Upon "voluntary termination" of plaintiff's employment, plaintiff would receive half of the vested amount over 25 months. Upon "involuntary termination" of plaintiff's employment, he would receive the vested amount or $150,000—whichever amount was greater—over 13 months. If plaintiff's termination was "for cause" (defined in the Agreement) or if, in the banks' determination, plaintiff had committed an act during his employment that would have given rise to termination "for cause", plaintiff would get nothing. Plaintiff would also forfeit any payment if he competed with the banks while receiving installment payments. The Agreement expressly reserved the banks' right to terminate plaintiff for any reason. The Agreement also provided for amendment by written consent of the parties. Finally, the banks could terminate the Agreement any time, with plaintiff receiving his vested amount.

When defendants proposed the Agreement, they showed plaintiff a projection of the banks' earnings that would increase his account to over $1,000,000 at the time of plaintiff's likely retirement in 2007. Mr. Fingersh told plaintiff that the projections were conservative and that plaintiff should be able to retire a wealthy man.

Tom Davies, President of The Olathe Bank, and Mark Parman, President of Hillcrest Bank, participated in similar phantom stock plans. Nothing was done by the banks to administer the Agreement until April or May of 1994, when, in response to questions from an FDIC regulator, an employee calculated the present value of the plans.

In April and May of 1994, an FDIC regulator conducted an examination of Oak Park Bank. The regulator presented her results at a May 23, 1994, meeting of the bank's board of directors, attended by plaintiff and Mr. Fingersh. The regulator indicated that she would recommend that the bank's MOU be lifted. The regulator then discussed plaintiff's Agreement, as reflected in the minutes of the meeting:

> Ms. Lang then commented on the deferred compensation plan which had been approved for President Herring. She noted three areas which needed correction: the first is that the contract included a provision that an account was to have been established at the beginning of the year, she said that account should be established as soon as possible; secondly, she noted that the agreement does not reference how the cost will be allocated among the three institutions, the contract should be amended to include this information; thirdly, she noted that the agreement does not reference how the plan will be funded. She indicated that if the bank funds the contract through a life insurance policy, all regulatory and accounting issues should be thoroughly addressed, including FASB 106 and APB 12, and should be approved by

the FDIC and the State Banking Department.

On July 1, 1994, the FDIC sent the bank a copy of its report, by which it lifted the MOU against the bank. The report complimented plaintiff for his work at the bank, attributing primary responsibility for the bank's improvement to plaintiff. The report also noted that plaintiff's account under the Agreement had not been established, "reminded" the bank to research thoroughly any possible mechanisms for funding the plan, and "encouraged" the bank to amend the Agreement to address how it would be funded and how the payment to plaintiff would be allocated among the three banks.

Although Mr. Fingersh was told during the examination of Oak Park Bank that funding plaintiff's plan would be required, he indicated to plaintiff at that time that defendants would not fund the plan. Nevertheless, after the May 23 board meeting, Mr. Fingersh believed that plaintiff's plan would have to be funded. The regulators did in fact require that the plan be funded. By August of 1994, the bank was negotiating with the FDIC not about the fact of the funding requirement, but about the method and frequency of funding.

The individual defendants, Mr. Fingersh, Mr. Blitt, and Mr. White, began to be dissatisfied with plaintiff's performance a few months into his employment. In particular, the owners found fault with plaintiff's management style, the marketing of the banks, and his inability to develop new business, a shortcoming exacerbated by the fact that plaintiff still commuted to Kansas City from Chicago. On July 6, 1994, Mr. Fingersh drafted an evaluation of plaintiff. In the evaluation, Mr. Fingersh complimented plaintiff for his efforts with problem loans and getting the MOUs lifted, and for exhibiting good leadership qualities and improving morale. Mr. Fingersh also noted a few possible improvements in the areas of sales and marketing, plaintiff's establishing himself in the community, overhead costs, and plaintiff's habit of co-opting other's ideas. The evaluation concluded: "We are encouraged about the future of the Banks and your participation in moving them ahead." Mr. Fing-

ersh did not give plaintiff the evaluation, however; because he was not involved in the day-to-day operation of the banks, he wanted to meet with employees to confirm his conclusions.

Within the next few weeks, Mr. Fingersh met separately with Mr. Davies, Mr. Parman, and Pat Humphrey, an Oak Park employee. In each meeting, Mr. Fingersh talked about general concerns regarding the direction of the banks and their organizational structure. Mr. Fingersh also asked each employee to set out his or her thoughts on those subjects in writing. Plaintiff was discussed only generally.

Mr. Fingersh then received memoranda back from each of the three employees. The memos generally addressed the structure of the banks and the author's ideas and frustrations about that structure. The memos also contained comments about and evaluations of various employees. The memos were critical of plaintiff. In his memo, Mr. Davies stated that plaintiff did not delegate enough, was not effective in developing business in Kansas City, and had not been successful in building a team at the banks. Mr. Parman, in his memo dated August 11, 1994, stated that plaintiff was an ineffective leader. Mr. Parman criticized plaintiff's management style, stating that plaintiff was domineering, egotistical, indecisive, and without direction. Mr. Parman also questioned plaintiff's work ethic, noting that plaintiff was not often at the office and worked a short week because of his travel to and from Chicago. In her memo, dated August 4, 1994, Ms. Humphrey criticized plaintiff for being reluctant to make decisions and for controlling things too much a low level instead of delegating and looking at the bigger picture.

Mr. Fingersh shared the three memos with Mr. Blitt and Mr. White. After discussing the matter, the owners decided to terminate plaintiff's employment. According to the owners, they terminated plaintiff basically for the reasons set forth in the memos; the subject of plaintiff's phantom stock plan did not arise in their discussions. On August 29, 1994, Mr. Fingersh terminated plaintiff. Mr. Fingersh did not give plaintiff any reason for the termination.

In accordance with the Agreement, plaintiff received $150,000 from the banks, in monthly payments of $7,500 for one year after the termination with a $60,000 payment in the thirteenth month. At the time of plaintiff's termination, the vested amount in his account under the Agreement was approximately $4,600. In 1995, the banks' phantom stock plans were terminated and replaced with cash bonus plans. When the banks hired plaintiff's replacement in 1995, he was offered a cash bonus plan allowing for deferred compensation with an accounting mechanism similar to the one involved in the Agreement with plaintiff.

## II. Summary Judgment Standard

When considering a motion for summary judgment, the court must examine all of the evidence in the light most favorable to the nonmoving party. *Jones v. Unisys Corp.,* 54 F.3d 624, 628 (10th Cir.1995). A moving party that also bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anglemyer v. Hamilton County Hosp.,* 58 F.3d 533, 536 (10th Cir.1995). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511. Summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to se-cure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed. R.Civ.P. 1).

## III. "Plan" Under ERISA

■ Defendants first argue that they are entitled to summary judgment on plaintiff's ERISA claim because the Agreement is not a "plan" governed by ERISA. The determination of whether a plan or policy is governed by ERISA is a mixed question of fact and law. *Peckham v. Gem State Mutual of Utah,* 964 F.2d 1043, 1047 n. 5 (10th Cir.1992).[2]

Section 510 refers to an "employee benefit plan". 29 U.S.C. § 1140. "Employee benefit plan" is defined to include an "employee pension benefit plan." 29 U.S.C. § 1002(3). This latter term is defined as follows:

[T]he terms "employee pension benefit plan" and "pension plan" mean any plan, fund, program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—

(i) provides retirement income to employees, or

(ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond....

29 U.S.C. § 1002(2)(A).

When viewed in the light most favorable to plaintiff, the express terms of the Agreement and the surrounding circumstances indicate that the Agreement provided retirement income to plaintiff or resulted in a deferral of his income until after the termination of his employment. Accordingly, a question of fact is created, and summary judgment is not appropriate on the basis that any plan here did not meet the statutory requirements.

The court still must determine, however, whether the Agreement even established a "plan, fund, or program" for purposes of

---

**2.** As it did in denying defendants' motion to dismiss, *see Herring v. Oak Park Bank,* 1996 WL 377088, at *2 n. 2 (D.Kan. June 24, 1996), the court treats this issue as substantive, rather than jurisdictional.

ERISA. The court has addressed this question once already, in denying defendants' motion to dismiss. *Herring v. Oak Park Bank,* 1996 WL 377088, at *2–4 (D.Kan. June 24, 1996). Applying the requisite standard for such a motion—construing the pleadings liberally, viewing all reasonable inferences in favor of plaintiff, and taking all well-pleaded facts as true—the court concluded that it did not appear beyond a doubt that plaintiff could prove no set of facts that would establish a "plan" under ERISA, and it therefore concluded that plaintiff should be allowed to offer evidence in support of the existence of such a "plan". *Id.* at *2–3. The court, examining the face of the Agreement, pointed to a number of factors that could, if developed by evidence, distinguish the instant case in material fashion from *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) and *Kulinski v. Medtronic Bio–Medicus, Inc.,* 21 F.3d 254 (8th Cir.1994), which programs were held not to constitute "plans" under ERISA.

In *Fort Halifax,* the United States Supreme Court defined a "plan" for purposes of ERISA. There a state statute required plants, upon their closing, to provide severance pay to each employee in the amount of one week's pay for every year worked, so long as the employee had worked at the plant for three years. *Fort Halifax,* 482 U.S. at 5, 107 S.Ct. at 2214. The Court held that an employee's claim under the statute was not preempted by ERISA because the statute did not establish a "plan" under ERISA. *Id.* at 6, 107 S.Ct. at 2214–15. The Court stated that a "plan" establishes "benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation." *Id.* at 11, 107 S.Ct. at 2217. The Court concluded that the case before it did not involve a "plan" under ERISA:

> The Maine statute neither establishes, nor requires an employer to maintain, an employee benefit *plan.* The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need

for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well *never* have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

*Id.* at 12, 107 S.Ct. at 2218 (footnote omitted). The Court later distinguished the severance pay from benefits with an ongoing, predictable obligation and from benefits requiring a regular payment. *Id.* at 14 n. 9, 18 n. 12, 107 S.Ct. at 2219 n. 9, 2221 n. 12.

■ Thus, under *Fort Halifax,* an ERISA "plan" involves an ongoing administrative scheme. *See Peckham,* 964 F.2d at 1048 (*Fort Halifax* requires an ongoing administrative program). The Tenth Circuit has not had occasion to apply *Fort Halifax* in a case involving severance pay or retirement benefits. Cases from the other circuits are instructive, however. In *Kulinski,* the Eighth Circuit distilled the teaching of those cases to formulate the following standard:

> The pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits. Simple or mechanical determinations do not necessarily require the establishment of such an administrative scheme; rather, an employer's need to create an administrative system may arise where the employer, to determine the employees' eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria.

*Kulinski,* 21 F.3d at 257; *accord Cvelbar v. CBI Ill. Inc.,* 106 F.3d 1368, 1375 (7th Cir. 1997) (quoting *Kulinski* ).

In its prior order, the court noted several characteristics of the Agreement that could potentially distinguish the case from *Fort Halifax* and *Kulinski.* *See Herring,* 1996 WL 377088, at *3. The court first pointed to language in the Agreement giving the banks the power to "administer" the Agreement and requiring them to set up an account ledger and update it at least annually. *Id.* Such provisions were absent from the other cases, and the court could not foreclose the possibility of plaintiff's offering evidence showing that such responsibilities required an administrative scheme. *Id.* The court also noted that plaintiff would receive nothing under the Agreement if the banks found conduct sufficient to warrant plaintiff's termination for cause. *Id.* Again, the court was unwilling to conclude that plaintiff would be unable to show that the exercise of such discretion necessitated the ongoing scheme required by *Fort Halifax.* Finally, the court pointed to the factual difference between *Fort Halifax* and *Kulinski,* which involved uncertain, contingent triggering events, and the present case, in which one of the triggering events was certain to occur. *Id.* This difference too, the court concluded, could prove material and support a determination that an ERISA "plan" exists here. *Id.*

In denying the motion to dismiss, the court stated that its analysis was "somewhat hampered by the plaintiff's failure to plead any facts supporting his assertion that the 'surrounding circumstances' bring the Agreement within the scope of ERISA." *Id.* at *3 n. 3. The court allowed the case to go forward because of its belief "that based on the totality of plaintiff's complaint, including the attached Agreement, the likelihood that discovery could assist the plaintiff in fleshing out his surrounding circumstances allegation is worthy of consideration here." *Id.* In summary, then, the court concluded that plaintiff might have been able to offer evidence to prove a set of facts that would exploit the differences with *Fort Halifax* and establish that the Agreement required an ongoing administrative scheme.

■ At this summary judgment stage, however, plaintiff is required to support his allegation with evidence by which a reason-able factfinder could conclude that the Agreement was a "plan" under ERISA. Plaintiff has failed to provide any evidence beyond the face of the Agreement itself establishing the need for an ongoing administrative scheme, and the court, after a thorough review of decisions from the other circuits, concludes as a matter of law, based on the uncontroverted facts in the record, that the Agreement's provisions do not establish a "plan" subject to ERISA.

■ First, the cases make it clear that a "plan" under ERISA is not implicated by an arrangement requiring only a lump sum payment after a triggering event. *See Velarde v. PACE Membership Warehouse, Inc.,* 105 F.3d 1313, 1316 (9th Cir.1997) (bonus and severance pay if employees stayed on until certain date); *Belanger v. Wyman–Gordon Co.,* 71 F.3d 451, 455 (1st Cir.1995) (early retirement offer); *Kulinski,* 21 F.3d at 257 (golden parachute); *James v. Fleet/Norstar Fin. Group,* 992 F.2d 463, 466 (2d Cir.1993) (stay-on bonus); *Angst v. Mack Trucks, Inc.,* 969 F.2d 1530, 1538 (3d Cir.1992) (buyout plan); *Fontenot v. NL Indus.,* 953 F.2d 960, 962 (5th Cir.1992) (golden parachute); *Wells v. General Motors Corp.,* 881 F.2d 166, 176 (5th Cir.1989) (severance pay).

Plaintiff has not provided evidence showing that the Agreement required substantial discretion or anything more than a simple, mechanical calculation to determine the specific sum to be paid to plaintiff upon the occurrence of one of a number of triggering events. There is no evidence that an ongoing administrative scheme was created—or was necessary—to make the appropriate calculation and send out the checks when the time came. The banks simply had to take a certain percentage of their profit, deduct plaintiff's carrying cost, and multiply by the vesting percentage. Plaintiff did not produce evidence that determining the relevant figures—the banks' profit, for example—were debatable or involved the exercise of any discretion by the banks.

The court further concludes that the requirement that the banks set up an account ledger and update it every year does not, in itself, change the situation. As explained above, in its prior order, the court concluded

that such requirement suggested that administration might have been required. *Herring,* 1996 WL 377088, at *3. In the absence of contrary evidence, however, the required calculation remains simple and mechanical, and the process of making that calculation and writing down the answer once a year can hardly be considered an ongoing scheme of the magnitude contemplated by the Supreme Court in *Fort Halifax.*

■ Nor is it material that some of the Agreement's triggering events provided for payment to plaintiff of the determined amount over a number of months. Courts have concluded that an ERISA "plan" is not created simply because the payment to the employee of a determined amount may be paid out in installments. *See Delaye v. Agripac, Inc.,* 39 F.3d 235, 237 (9th Cir.1994) ("While payment could continue for as long as two years, there is nothing discretionary about the timing, amount, or form of the payment."), *cert. denied,* 514 U.S. 1037, 115 S.Ct. 1402, 131 L.Ed.2d 289 (1995); *James,* 992 F.2d at 466 ("The employee's option to receive the money in bi-weekly installments instead of in a lump sum did not change the basic situation."); *Wells,* 881 F.2d at 176 (employee could elect to receive payment over two years instead of in lump sum). Plaintiff's agreement called for a lump sum payment with respect to some triggering events and payment of a fixed sum in installments with respect to other triggering events, including his involuntary termination. The fact that the banks might have had to (and in fact did) write and send out several checks instead of just one to satisfy the determined amount does not create an ongoing administrative scheme under *Fort Halifax.*

The circuit court cases that have applied *Fort Halifax* in finding an ERISA "plan" may be easily distinguished from the present case by the amount of discretion exercised by the employer. In *Bogue v. Ampex Corp.,* 976 F.2d 1319 (9th Cir.1992), *cert. denied,* 507 U.S. 1031, 113 S.Ct. 1847, 123 L.Ed.2d 471 (1993), the employer had to decide whether the employee's new job was "substantially similar" to his or her former job. *Id.* at 1323. The court noted the great amount of

discretion involved in such a determination: "There was no way to carry out that obligation with the unthinking, one-time nondiscretionary application of the plan administrators in *Fort Halifax* and *Wells.*" *Id.* The court concluded that the program could not be administered without an administrative scheme. *Id.* In *Simas v. Quaker Fabric Corp.,* 6 F.3d 849 (1st Cir.1993), the employer also exercised a great deal of discretion because the employer first had to determine whether the employee would be eligible for unemployment compensation. *Id.* at 853. Here, the banks were not required to exercise such great discretion to determine whether plaintiff was eligible to receive the payments; the banks merely had to take note of which triggering event had occurred, a decision that did not require an administrative scheme.

*Williams v. Wright,* 927 F.2d 1540 (11th Cir.1991), in which retirement benefits were deemed a "plan", is also readily distinguished. In *Williams,* the employee received monthly retirement benefits, medical premiums, country club dues, use of a car, and reimbursement for certain meals at the country club upon presentation of receipts. *Id.* at 1542 n. 3. The court held that the arrangement created continuing obligations necessitating ongoing procedures. *Id.* at 1544. Here, on the other hand, the specific amount due plaintiff was set and could be determined at the time of the triggering event; unlike *Williams,* there was no variance or discretion in the amount of the periodic payments, and those payments had a specified duration.

At first glance, the present case resembles *Cvelbar* with respect to the issue of discretion. There the court, in concluding that the arrangement at issue was a "plan", noted that the employer, like the banks here, had to determine the reasons for the employee's termination and monitor whether the employee competed against the employer. *Cvelbar,* 106 F.3d at 1377. Nevertheless, the employer in *Cvelbar* had more managerial discretion than is present here. In that case, the employer had to monitor the amounts paid and determine whether, in the sole discretion of the employer's counsel, the pay-

ments constituted parachute payments. *Id.* The employer also had to review the contract annually to decide whether to extend its terms for additional years. *Id.* The court concluded that these obligations required an ongoing administrative scheme. *Id.* at 1376.

The *Cvelbar* court further concluded that the payments to be made to the employee could not be determined by simple arithmetical calculation. The employer was obligated to process medical claims and pay medical benefits, which would vary in amount over time. *Id.* at 1377–78. The contract also called for a monthly pension payment in an amount equal to the amount the employee would receive at age 65 under the employer's retirement plan; that payment would continue until the employee reached 65 or began receiving benefits under the retirement plan. *Id.* at 1378. The court noted that the employee's circumstances thus had to be analyzed in light of the retirement plan in order to determine his eligibility for and level of benefits:

> To determine Mr. Cvelbar's eligibility and level of benefits, the company had to analyze his circumstances in light of [the company's] existing retirement plan. The benefits to be paid Mr. Cvelbar therefore could not be calculated mechanically without administrative involvement. By referencing the [retirement plan], the Agreement not only required that the existing plan be maintained, but it required the company to make administrative determinations about coverage and eligibility, determinations that were not simple mechanical calculations.

*Id.* (footnote omitted).

Thus, unlike the present case, *Cvelbar* involved neither a simple arithmetical calculation nor a monetary payment of a determined amount. The employer there held a great amount of discretion, and the contract could only be administered by reference to another plan, which itself required administration. Such earmarks of an ongoing administrative scheme cannot be found in the present case.

In the prior order, the court noted that the banks could prevent plaintiff from receiving anything by determining that plaintiff had committed an act giving. rise to termination "for cause". *Herring,* 1996 WL 377088, at \*3. In two cases, however, the Ninth Circuit concluded that although a termination "for cause" would change the employee's benefits, such "minimal quantum of discretion" was not "sufficient to turn a severance agreement into an ERISA plan." *Velarde,* 105 F.3d at 1317 (citing *Delaye,* 39 F.3d at 237). In *Cvelbar,* the court noted the employer's discretion in determining the reason for the employee's termination, but, as discussed above, many more opportunities for the exercise of discretion were present in that case.

Here, the ability to terminate plaintiff's employment "for cause", as defined in the Agreement, did not itself carry such discretion as to create an ongoing administrative scheme. Although a termination for cause would effect the amount of any payment (by reducing it to zero), that decision would not be made within any process of administering the Agreement. It is significant in that respect that termination for cause was not listed as one of the seven triggering events—the "for cause" language was included as a separate provision. Therefore, the banks' performance under the Agreement did not involve such discretion as to implicate an administrative scheme.

Thus, the cases in which "plans" have been found involved either a great deal of managerial discretion to determine eligibility or a continuing obligation of the employer that could not be determined by simple calculation. Plaintiff's employer did not have substantial discretion, and none regarding the timing, method, or form of payment. Although the payment might be made to plaintiff in installments, the amount was determined at the triggering event by simple calculation. Most importantly, the Agreement did not necessitate an ongoing administrative scheme.

The court further concludes that the certainty of the occurrence of a triggering event does not convert the Agreement into an ERISA "plan". In *James,* the Second Circuit noted that the Supreme Court in *Fort Halifax* had stressed the contingent nature of the obligation. *James,* 992 F.2d at 467. The court recognized, however, that *Fort*

*Halifax* turned not on that fact, but on the absence of an ongoing administrative scheme, and it concluded that, despite their certainty, the nature of the payments in the case before it "did not require an ongoing administrative employer program to effectuate them." *Id.* Similarly, other courts have refused to find a "plan" within the meaning of ERISA despite a certain payment. *See Velarde,* 105 F.3d at 1316; *Belanger,* 71 F.3d at 455; *Wells,* 881 F.2d at 176.

In denying defendants' motion to dismiss, the court, relying solely on the complaint and the face of the Agreement, distinguished *Fort Halifax* and *Kulinski* on the basis of the contingent nature of the payments in those cases. *See Herring,* 1996 WL 377088, at *3. The court could not help but notice such an obvious factual difference in deciding that plaintiff should at least be permitted to attempt to develop a record showing an ongoing administrative scheme. Upon consideration of the evidence so developed and submitted and upon a thorough review of the caselaw, the court concludes that the noncontingent nature of the payment in this case is not enough to create a "plan", when considered together with all relevant factors. The existence of an ongoing scheme is the necessary ingredient under *Fort Halifax.* In fact, in *Kulinski,* the court did not even rely on the fact that the hostile takeover required in the agreement there might not occur; rather, it determined that a "plan" did not exist because the simple, mechanical task of making a calculation and writing a check did not require the establishment of an ongoing administrative scheme. *Kulinski,* 21 F.3d at 258. Here, as in *James,* the fact that one of the Agreement's triggering events was bound to occur does not create an ongoing administrative scheme where none would otherwise exist, which absence compels the conclusion that the Agreement did not create a "plan".

*Belanger* provides further support for the court's conclusion here. In that case the First Circuit recognized the employee's perception of the employer's obligation as a relevant factor in this inquiry: "One very important consideration is whether, in light of all the surrounding facts and circumstances, a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits." *Belanger,* 71 F.3d at 455. This factor supports the conclusion that an ERISA "plan" did not exist here. The Agreement clearly called for payment of a determined amount, either by lump sum or payment over one or two years; plaintiff could not have perceived the Agreement as instituting an ongoing commitment by the banks to provide benefits. Moreover, plaintiff conceded that payment under the Agreement involved only a simple calculation without discretion.[3]

In summary, plaintiff has not provided evidence beyond the face of the Agreement in support of his allegation that the Agreement was a "plan" for purposes of ERISA. Analysis of the Agreement and the relevant factors as discussed in other cases convinces the court that the Agreement did not necessitate an ongoing administrative scheme. Accordingly, the court concludes that the Agreement does not constitute a "plan" for purposes of applying ERISA, and therefore plaintiff's ERISA claim cannot stand.

## IV. Interference with Plaintiff's ERISA Rights

█ Even if the Agreement had created an ERISA "plan", defendants are entitled to summary judgment because plaintiff has failed to raise a question of fact regarding the substance of his claim under section 510. That section makes it unlawful to discharge a participant "for the purpose of interfering with the attainment of any right to which such participant may become entitled" under

---

**3.** Another factor indicating the absence of a "plan" here is the fact that the Agreement related only to one beneficiary. In denying defendants' motion to dismiss for lack of an ERISA "plan", the court concluded that this factor was not dispositive and that an ERISA "plan" could have only one beneficiary. *Herring v. Oak Park* *Bank,* 1996 WL 377088, at *3 (D.Kan. June 24, 1996). The existence of a single beneficiary, however, does suggest that an actual administrative program was not required for the Agreement's administration. Thus, this factor, though not determinative in itself, supports the court's conclusion.

an employee benefit plan. 29 U.S.C. § 1140. The Tenth Circuit has stated:

> To recover under § 510 the plaintiff must demonstrate that the defendant employer had the specific intent to violate ERISA and that this illegitimate motive was one of the factors in the employer's decision to terminate the plaintiff. Although a plaintiff can use circumstantial evidence to prove his claim, the evidence must be specific and must allow the reasonable factfinder to find that one of the employer's motives was to violate ERISA.

*Dodson v. New York Life Ins. Co.*, 1991 WL 180090, at *2 (10th Cir. Sept. 10, 1991) (citing *Gavalik v. Continental Can Co.*, 812 F.2d 834 (3d Cir.), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987)); *accord Phelps v. Field Real Estate Co.*, 991 F.2d 645, 649 (10th Cir.1993) (citing *Gavalik* and *Dister v. Continental Group*, 859 F.2d 1108 (2d Cir. 1988)); *see also Card v. Hercules Inc.*, 1993 WL 351337, at *3 (10th Cir. Aug. 19, 1993) (plaintiff must show a "specific intent to interfere"). The question is thus whether the employer took the action it did "at least in part" to protect the employee plan. *Phelps*, 991 F.2d at 649.

■ In the absence of direct evidence of an intent to interfere, courts in this district have routinely followed *Gavalik* and *Dister* and analyzed claims under section 510 under the three-step burden-shifting approach from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See, e.g., Torre v. Federated Mutual Ins. Co.*, 897 F.Supp. 1332, 1367 (D.Kan.1995); *Sloan v. Boeing Co.*, 1994 WL 149197, at *10 (D.Kan. Apr. 1, 1994); *Zimmerman v. Sloss Equip.*, 1993 WL 500888, at *4 (D.Kan. Nov. 16, 1993), *aff'd*, 72 F.3d 822 (10th Cir.1995). Because of the Tenth Circuit's reliance on *Gavalik* and *Dister* for other purposes, the court believes that the Tenth Circuit would likely follow those cases further and use the *McDonnell Douglas* framework in this context. *See Maez v. Mountain States Tel. & Tel.*, 54 F.3d 1488, 1504 (10th Cir.1995) (citing *Gavalik* for requirements for prima facie case under sec-

tion 510); *Phelps*, 991 F.2d at 649 (citing *Gavalik* and *Dister* in generally laying out required showing under section 510); *see also Dister*, 859 F.2d at 1111 (applying *McDonnell Douglas* analysis) *Gavalik*, 812 F.2d at 852 (same).

■ Applying the *McDonnell Douglas* framework in this case, plaintiff must first make out a prima facie case that defendants acted with the specific intent to interfere with plaintiff's rights under the Agreement. If Plaintiff succeeds with his prima facie case, defendants have the burden to produce a legitimate, non-discriminatory reason for plaintiff's termination. Finally, if defendants meet that burden of production, plaintiff carries the ultimate burden of proving either that it was more likely that defendants terminated plaintiff in order to interfere or that defendants' reason was pretextual. *See Gavalik*, 812 F.2d at 853.

■ The court concludes that plaintiff has failed to make out a prima facie case that defendants terminated him with the specific intent to interfere with his rights under the Agreement. Plaintiff asserts that defendants terminated him to avoid the FDIC's requirement that the Agreement be funded. As evidence of such intent, plaintiff points to the amount of money defendants would save if plaintiff were not permitted to accrue great amounts in his account over the life of the Agreement. Such evidence is not sufficient, however; "plaintiff must present some evidence indicating that his loss of ERISA benefits was more than a mere 'incidental' result of his termination." *Babich v. Unisys Corp.*, 842 F.Supp. 1343, 1353 (D.Kan.1994) (citing *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1224 (11th Cir.1993)); *accord Sloan*, 1994 WL 149197, at *11; *Pfannenstiel v. Seaboard Corp.*, 1990 WL 98318, at *3 (D.Kan. July 9, 1990).

As additional evidence of a specific intent to interfere with his rights under the Agreement, plaintiff cites the fact that Mr. Fingersh did not offer an explanation when he fired plaintiff. Plaintiff also asserts that the timing of his termination is sufficient to establish his prima facie case, noting that he was terminated only a few months after the FDIC required the Agreement to be funded.

■ It is true in a general sense that timing may provide the necessary inference of an intent to interfere. For instance, in *Dister*, the plaintiff made out a prima facie case by showing that he was terminated mere months before his rights were scheduled to vest. *Dister*, 859 F.2d at 1115. Similarly in *Babich*, the court noted that the plaintiff was only 19 months away from receiving benefits at the time of his termination. *Babich*, 842 F.Supp. at 1355. The circumstances of timing are entirely different here, however. Plaintiff was not terminated just before any significant event with respect to his benefits under the Agreement. Rather, plaintiff argues that the timing of the termination was suspicious in relation to the FDIC's funding requirement. The court does not believe that this evidence of timing raises the necessary inference of a specific intent to interfere.

Plaintiff's claim is somewhat attenuated; under his theory, plaintiff, to satisfy section 510, must show that defendants terminated him to avoid funding the plan *and* that defendants wished to avoid funding the plan in order to interfere with plaintiff's rights under the Agreement. Plaintiff has produced no evidence whatsoever in support of this latter component of proof. For instance, plaintiff has not produced evidence concerning the details of funding such a plan, including how funding the plan would have a deleterious effect on the banks. Plaintiff might argue that it would cost the bank money to fund the plans, but it is uncontroverted that terminating plaintiff cost the banks $150,000, while only $4,600 of the plan had vested. Thus, it would have been cheaper for the banks to retain plaintiff than to terminate him, at least in the short run; the court cannot speculate on the long-term effect of funding the plan in the absence of any evidence on that point. Moreover, plaintiff bargained for and received an unfunded plan. Therefore, the banks' refusal to fund the plan cannot have interfered with any rights of plaintiff under the Agreement as bargained for. Accordingly, even if one were to assume that defendants did terminate plaintiff to avoid funding the plan, a reasonable jury could not find from that fact alone that defendants acted with a specific intent to interfere with plaintiff's rights under the Agreement.

In addition, even viewed in plaintiff's favor, the timing evidence does not raise a reasonable inference that defendants terminated plaintiff to avoid funding the plan. Mr. Fingersh was made aware of FDIC concerns about funding the Agreement during the bank examination in April and May of 1994. After the board meeting on May 23, 1994, Mr. Fingersh believed that funding the Agreement would be required. Despite that knowledge, Mr. Fingersh drafted an evaluation that clearly contemplated plaintiff's continued employment at the banks. Mr. Fingersh did not terminate plaintiff until the end of August, shortly after receiving feedback from three employees about the banks and plaintiff.

As noted above, the timing evidence here is not as significant as in other cases because the timing was not in relation to an imminent receipt or accumulation of benefits. Moreover, the probative value of evidence that a termination followed another event necessarily diminishes as more time passes, and at least three months elapsed between the time Mr. Fingersh knew of the funding requirement and plaintiff's termination. The court might reach a different conclusion if plaintiff could point to a particular event with respect to the funding requirement—for example, an ultimatum handed down by the FDIC—that occurred closer to the time of plaintiff's termination, with respect to which a cause-and-effect relationship would seem more plausible. Plaintiff has provided no such evidence, however.

Thus, because the timing of plaintiff's termination does not create the necessary inference, the court is left with the fact that Mr. Fingersh did not tell plaintiff the reasons for his termination. Such evidence is not sufficient to satisfy plaintiff's burden of establishing a prima facie case of interference under section 510, and summary judgment is therefore appropriate in favor of defendants.

■ Even if plaintiff could succeed in making out a prima facie case, he cannot meet the third step of the *McDonnell Douglas* test. Defendants easily meet their bur-

den of producing legitimate reasons for plaintiff's termination; defendants have provided ample evidence that they terminated plaintiff for the reasons generally embodied in the memoranda from Mr. Parman, Mr. Davies, and Ms. Humphrey. The weak evidence of a specific intent to interfere offered by plaintiff does not allow the reasonable factfinder to conclude that plaintiff's termination more likely resulted from the discriminatory reason proposed by plaintiff. Nor has plaintiff provided evidence undermining and showing the pretextual nature of the reasons produced by defendants.

In their memos, the three employees criticized plaintiff's management style, indecisiveness, work ethic, and marketing efforts. To show pretext, plaintiff has attempted to take particular comments from the memos and use deposition testimony of the employees to show why the criticism might be unwarranted. For instance, in his memo Mr. Parman noted that plaintiff was often out of the office, and he questioned plaintiff's work ethic. To rebut that point, plaintiff points to Mr. Davies's testimony that, when in town, plaintiff generally came in early and left late. Plaintiff also notes that the testimony of Mr. Parman and Mr. Davies did not agree concerning whether the two men met with Mr. Fingersh separately or together. Plaintiff is not successful, however, in his other attempts to use the employees' own testimony to contradict the criticisms in their memos.

The court concludes that plaintiff has not made the requisite showing of pretext here. The minor discrepancies discovered by plaintiff do not call into question the general and consistent complaints lodged by the three employees. Moreover, plaintiff has not offered any independent evidence that the criticisms were wholly unfounded; there is no evidence from different employees, for example, applauding plaintiff's management style or decisionmaking. Nor has plaintiff provided evidence suggesting that the employees' memos should not be trusted. Plaintiff tries to paint a picture of an owner trolling for complaints about plaintiff in order to "build a

file" to justify plaintiff's eventual termination, but that picture lacks evidentiary foundation. Mr. Fingersh and the employees testified that plaintiff was discussed only generally in the meetings and that Mr. Fingersh did not specifically solicit opinions about plaintiff, and plaintiff cannot controvert that evidence. Moreover, the memos themselves, which discuss plaintiff in relatively small part, make clear that they were written not merely to disparage plaintiff, but to provide comments about the overall direction and structure of the banks.

Finally, plaintiff relies on *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), in arguing that summary judgment is not appropriate when state of mind is at issue; thus, plaintiff believes that he should be able to test defendants' credibility regarding their intent before a jury. In *Anderson v. Liberty Lobby*, however, the Supreme Court has express rejected such an interpretation of *Poller*. *See Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514–15. The Court held that a plaintiff could not defeat summary judgment merely by asserting that the jury could disbelieve the defendant, even if the evidence is likely to be within the possession of the defendant. *Id.* "Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* at 257, 106 S.Ct. at 2514. Here, plaintiff has not produced affirmative evidence from which a reasonable jury could return a verdict in his favor. Accordingly, summary judgment is appropriate.

Because plaintiff has not provided evidence of pretext sufficient to satisfy the third step of the *McDonnell Douglas* test, defendants are entitled to summary judgment on plaintiff's claim under section 510 of ERISA.

## V. Civil Conspiracy Claim

Because plaintiff's civil conspiracy claim is predicated on a violation of ERISA, defendants are entitled to summary judgment on that claim as well.

IT IS THEREFORE ORDERED BY THE COURT THAT defendants' motion for summary judgment (Doc. 52) is granted, and plaintiff's claims are hereby dismissed.

IT IS FURTHER ORDERED THAT defendants' motion to strike plaintiff's demand for jury trial and to strike plaintiff's claim for punitive damages (Doc. 51) is denied as moot.

IT IS SO ORDERED.